*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0379p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JAMES DAUGHERTY,

        *Plaintiff-Appellant,*

    *v.*

SAJAR PLASTICS, INC,

        *Defendant-Appellee.*

No. 06-4608

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 05-02787—Patricia A. Gaughan, District Judge.

Argued: September 17, 2007

Decided and Filed: October 16, 2008

Before: MOORE and GRIFFIN, Circuit Judges; GRAHAM, District Judge.[*]

---

## COUNSEL

**ARGUED:** Richard N. Selby II, DWORKEN & BERNSTEIN, Painesville, Ohio, for Appellant. Christine T. Cossler, WALTER & HAVERFIELD, Cleveland, Ohio, for Appellee. **ON BRIEF:** Richard N. Selby II, DWORKEN & BERNSTEIN, Painesville, Ohio, for Appellant. Christine T. Cossler, Eric J. Johnson, WALTER & HAVERFIELD, Cleveland, Ohio, for Appellee.

---

## OPINION

---

    GRIFFIN, Circuit Judge. Plaintiff James Daugherty appeals from the district court's order granting summary judgment in favor of his former employer, defendant Sajar Plastics, Inc., on his claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2000), the Ohio Civil Rights Act ("OCRA"), OHIO REV. CODE § 4112.02, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*. For the reasons stated below, we affirm in part and reverse in part.

---

[*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

1

I.

In July 1999, James Daugherty began working for Sajar Plastics, Inc. ("Sajar") as a maintenance technician. Sajar manufactures plastic injection molding components for use in the medical and banking industries. According to the job description issued by Sajar, the general function of the maintenance technician position is to "maintain buildings and equipment in satisfactory condition and make repair[s] as necessary." The maintenance technician "performs [a] variety of crafts – electrical, hydraulics, pneumatics, welding, pipe fitting, troubleshoots and repairs all plant equipment, performs repairs on manufacturing facilities and office areas including: plumbing, light fixtures, electrical, mechanical, etc." In addition to the use of hand and power tools, the position requires the operation of dangerous machinery such as bandsaws, milling machines, power tools, forklift trucks, welders, drill presses, and overhead cranes. The physical demands of the job require "medium to heavy strength level," "frequent standing and walking, 9-10 hours a day, 2-3 hours at a time," and "frequent stooping, bending and kneeling, and climbing, occasional work in confined, tight or awkward spaces."

Daugherty experienced a back injury sometime in the 1980's that quieted but then flared up again in 2000 and 2001, while he was working at Sajar. Daugherty's physician, Dr. Peter Franklin, prescribed increasing doses of Oxycontin and Duragesic. When Daugherty first began to take the medication, he experienced disorientation and dizziness. He received a three-month reprieve from dangerous electrical work, during which time he developed a tolerance for the medication and no longer experienced these side effects. While at Sajar, Daugherty suffered from unpredictable episodes of increased back pain that temporarily rendered him unable to perform his job duties. He requested and always was granted intermittent FMLA leave, ranging from approximately two days to two weeks.

Daugherty alleges that his supervisors at Sajar expressed frustration about his intermittent leave time and unexpected absences related to his back problem. According to Daugherty, Human Resources Director Ronald Alexander purportedly told him in October 2003 that he faced the choice of either taking disability retirement or losing his job.

In November 2003, Daugherty requested and received an FMLA leave of more significant duration: one to two months. Contemporaneously with his leave request, Daugherty presented Sajar with a note from Dr. Franklin indicating that he would be able to return to work approximately two months later, on January 5, 2004. Daugherty alleges, however, that before taking his leave, Alexander warned him that "if I took that FMLA for that period of time, there would not be a job waiting for me, when I returned." Alexander disputes this claim.

Shortly after Daugherty took this FMLA leave, Sajar experienced a layoff. Along with positions in other departments, Sajar needed to lay off one maintenance worker. Daugherty had the least seniority of the maintenance technicians, but because he was on FMLA leave, he was not laid off immediately. At the end of December 2003, however, Human Resources Manager Ranae Cozzone notified Daugherty that he would be placed on layoff status effective January 5, 2004, the day he was scheduled to return from leave. He was informed by management that he had been selected for layoff because he was lowest in seniority. Daugherty neither disputes that the layoff was legitimate nor that he was the least senior maintenance technician.

In February 2004, Sajar experienced an upturn in business and thus needed to hire another maintenance technician as soon as possible because of the increased workload. Alexander directed Cozzone to recall Daugherty. Alexander made Daugherty's return to work contingent upon a physical examination by Dr. Richard Altemus, a physician used by Sajar on a routine referral basis

to perform drug screenings and pre-employment and post-accident examinations.[1] On February 17, 2004, Dr. Altemus examined plaintiff and, in a letter to Cozzone written on that same day, he opined:

> In summary, Mr. Daugherty appeared fit with no apparent problems pertinent to his joints or back. He had no problems with the rigors of the physical examination. However, there were current medication patches affixed to his back and several residual stains of previous patches. The patient was forthcoming with his admission of daily Oxycontin oral medication and daily Duragesic (Fentanyl) transdermal medications. Both of these medications are Class II narcotics.
>
> In my opinion, Mr. Daugherty would be able to successfully complete the duties commensurate with the job description provided me. But, because of the significant medication taken on a daily basis (both in type and strength), I do not feel comfortable in approving this man's reemployment at this time. The analgesics may mask the symptoms of a reinjury thus exacerbating his current disease or, more importantly, the amount of medication may cause an impairment of perception or judgment which might lead to an injury to himself or others.

In his deposition, Dr. Altemus further explained that he based his recommendation on the potential side effects of Daugherty's medications, his physical impairment, and Sajar's zero-drug policy applicable to narcotics as well as illegal drugs. Dr. Altemus testified that he ascertained the risks posed by Daugherty's medications by considering dosage levels, documentation in the Physicians' Desk Reference ("PDR"), the possible interaction between the Oxycontin and Duragesic patches, and Daugherty's job description. According to Dr. Altemus, based upon Daugherty's dosage levels, the PDR cautioned that either narcotic could impair his ability to operate heavy machinery, and further stated that individuals who combine Oxycontin and other narcotics could experience other dangerous side effects, such as profound sedation or coma. Dr. Altemus also opined that when Oxycontin is taken with other opiates, the individual may demonstrate syncope or a sudden loss of blood pressure and "you drop." Considering these factors, Dr. Altemus concluded that plaintiff was physically unable to perform those duties consistent with his job description because of "excessive medication" that "may mask symptoms and may impair judgment."

Alexander and Cozzone decided that Daugherty's medications placed Sajar at risk of liability for injury to Daugherty or his coworkers. Cozzone nonetheless called Daugherty and advised him that if he could provide documentation regarding a reduction in his medications, the company "would take a look at it." Approximately two weeks later, Daugherty supplied Sajar with a brief note from Dr. Franklin stating, "TO WHOM IT MAY CONCERN Mr. Daugherty is stable on long term opoid [sic] management for chronic pain and is able to do the same work he has been doing on this medication in recent years." The note neither addressed the amount of medication Daugherty was taking nor indicated that the dosage had been reduced.

On March 18, 2004, Daugherty called Cozzone and informed her that his physician had reduced his medication dosages. When Cozzone asked him to submit written confirmation from Dr. Franklin, Daugherty refrained from doing so upon the advice of his attorney. On March 26, 2004, Cozzone sent a letter to Daugherty advising him that Sajar needed a note from his physician on or before April 2, 2004, confirming the reduction in his medication; otherwise, "we will assume that you have no interest in returning to Sajar Plastics . . . and you will not be eligible for any immediate

---

[1]Dr. Altemus was not a physician under contract with Sajar; rather, he operated a private practice in close proximity to Sajar's facility. As Alexander explained, "If we need any special attention, he's available, because he's close. It's probably more for convenience."

opens [sic] that may occur." No such note was forthcoming from plaintiff or his physician. Consequently, in a letter dated April 22, 2004, Alexander informed Daugherty that Sajar had filled a maintenance position, which had opened between April 2 and April 19, with another technician:

> As of this date, we still have not seen a note from your Physician. However, on or about April 5, 2004 you called our offices and left a voice mail message with Ranae Cozzone and requested her to call your Doctor direct for the information which we asked you to obtain.
>
> Please understand, this office has requested twice, that you provide us with specific information relating to your medical condition. We are not going to gather this information for you.
>
> As i[t] stands currently, this office has no information which changes your employment status. In fact, you were to supply this office with the above mentioned information on or before April 2, 2004. Here it is April 22, 2004, and you still have not provided anything to support your claim that you are able to return to work. Since our request to you for information from your Doctor, an opening has occurred during the period of April 2, 2004, and April 19, 2004. Since you did not respond to our request in a timely fashion, we filled the position. If you want to be available for the next opening, I would suggest you supply this office with the requested information.

Daugherty never supplied the requested information. In accordance with the terms of Sajar's Employee Handbook, because Daugherty did not return to work within six months of being placed on layoff status, his employment was terminated. On May 12, 2004, Daugherty filed a charge of discrimination with the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a right to sue letter to Daugherty dated September 30, 2005.

On November 3, 2005, Daugherty filed a complaint in Ohio state court, alleging disability discrimination under the ADA and OCRA and retaliation under the FMLA. The case was removed to federal district court on the basis of federal question jurisdiction. Sajar thereafter moved for summary judgment on all counts pursuant to Federal Rule of Civil Procedure 56(c).

On November 6, 2006, the district court issued an opinion and order granting Sajar's motion and dismissing all claims. *Daugherty v. Sajar Plastics, Inc.*, No. 1:05 CV 2787, 2006 WL 3228761 (N.D. Ohio, Nov. 6, 2006). The district court concluded that Daugherty failed to adduce sufficient proof that he was either disabled or regarded as disabled by Sajar within the meaning of the comparable provisions of the ADA and OCRA and, therefore, dismissed the state and federal disability discrimination claims. Regarding Daugherty's claim of retaliatory discharge under the FMLA, the district court "assume[d] plaintiff has presented enough evidence to show an issue of fact as to whether [a] prima facie case has been established," but concluded that Sajar asserted legitimate reasons for its adverse decisions, which Daugherty then failed to show were pretextual in nature. *Daugherty*, 2006 WL 3228761 at *9. The court dismissed Daugherty's claim under the FMLA and entered judgment in favor of Sajar on all claims. Daugherty now timely appeals.

## II.

We review de novo the district court's order granting summary judgment. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED R. CIV. P. 56(c). In evaluating summary judgment,

we must view all the facts and the inferences drawn from it in the light most favorable to the nonmoving party. *Kleiber,* 485 F.3d at 868. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Only disputed material facts, those "that might affect the outcome of the suit under the governing law," will preclude summary judgment. *Id.* at 248. The function of the court in assessing a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

III.

Daugherty first challenges the summary judgment entered against him on his disability discrimination claims under the ADA and the OCRA. In light of the fact that Ohio's disability discrimination law parallels the ADA in all relevant respects, we apply the same analytical framework, using cases and regulations interpreting the ADA as guidance in our interpretation of the OCRA. *Wysong v. Dow Chemical Co.*, 503 F.3d 441, 450 (6th Cir. 2007); *City of Columbus Civil Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998). Our analysis of Daugherty's ADA claim also resolves his state law discrimination claim. *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 452 n.4 (6th Cir. 2004).

The ADA prohibits discrimination by a covered entity "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[2] A prima facie case of disability discrimination under the ADA requires that a plaintiff show: "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007) (internal citation and quotation marks omitted).

Where a plaintiff, like Daugherty, seeks to establish a prima facie case by means of circumstantial evidence, we apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 364. The plaintiff's burden at the summary judgment stage "is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.* There are "various context-dependent ways by which plaintiffs may establish a prima facie case, and not rigid requirements that all plaintiffs with similar claims must meet regardless of context." *Id.* at 365 (emphasis omitted).

It is well settled that not every physical or mental impairment constitutes a disability under the specific parameters of the ADA. *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 195 (2002); *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir. 2007). The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of

---

[2]The OCRA similarly prohibits "any employer, because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." OHIO REV. CODE § 4112.02.

such an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). *See also* OHIO REV. CODE § 4112.01(A)(13). "If [an employee's] condition does not meet one of these categories even if he was terminated because of some medical condition, he is not disabled within the meaning of the Act. The ADA is not a general protection for medically afflicted persons." *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005).

The district court in the present case found that Daugherty failed to demonstrate adequately that he suffers from a substantially limiting, ADA-qualifying impairment, as defined by § 12102(2)(A). On appeal, Daugherty does not further pursue this issue and thus waives his claim that Sajar discriminated against him on the basis of an actual disability. *Harris v. Bornhorst*, 513 F.3d 503, 518 (6th Cir. 2008). Our review is therefore confined to Daugherty's contention that Sajar illegally regarded him as disabled, under the alternative definition of disability set forth in § 12102(2)(C).

The regarded-as-disabled prong of the ADA "protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (internal citations and quotation marks omitted). Individuals may be regarded as disabled when "'(1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities.'" *Id.* (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999)). In either case, it is necessary to show that the employer entertains misperceptions about the employee. *Id.*

Daugherty alleges that Sajar mistakenly regarded him as substantially limited in the major life activity of working.[3] We have acknowledged that proving such a claim "takes a plaintiff to the farthest reaches of the ADA" and is a question "imbedded almost entirely in the employer's subjective state of mind." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001). In addition to the unique hurdles posed by the psychological component of a regarded-as-disabled claim when the major life activity at issue is working, the statutory phrase "substantially limits" takes on special meaning in this context and imposes a stringent standard, requiring proof that the employer regarded the employee as "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 317 (6th Cir. 2001) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). *See also Sutton*, 527 U.S. at 492 (citing § 1630.2(j)(3)(i) and noting that "one must be precluded from more than one job, a specialized job, or a particular job of choice."). Consequently,

> proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult. Yet the drafters of the ADA and its subsequent interpretive regulations clearly intended that plaintiffs who are mistakenly regarded as being unable to work have a cause of action under the statute. Whether [the employee] is such a plaintiff lies

---

[3] "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). These activities share the quality of being "'of central importance to daily life.'" *Bryson*, 498 F.3d at 575 (quoting *Williams*, 534 U.S. at 196).

in the question of whether [the employer] regarded him as substantially limited from performing a broad class of jobs.

*Ross*, 237 F.3d at 709.

Daugherty submits that in the context of summary judgment, he has raised a genuine issue of material fact as to whether Sajar misperceived his back condition and related medication use as significantly restricting his ability to perform either a class of jobs or a broad range of jobs. He argues that, despite Dr. Franklin's medical opinion that he would be fit to return to work without restrictions on or about January 5, 2004, Sajar viewed him as unable to work, as evidenced primarily by Dr. Altemus's "flawed" medical evaluation purportedly recommending that Daugherty should not perform any job that entailed the use of heavy machinery. Daugherty, however, misconstrues the substance of Dr. Altemus's evaluation, and we are not persuaded that the evidence raises a genuine issue of material fact in terms of the relevant *Ross* inquiry.

Dr. Altemus did not, as Daugherty claims, express the viewpoint that Daugherty was significantly restricted in his ability to perform a broad range of jobs. Rather, Dr. Altemus concluded, based upon plaintiff's daily dosage of OxyContin and Fentanyl and the possible dangerous side effects of these drugs cited in the PDR, that there was a high risk of impairment and ensuant injury while operating the dangerous machinery that was an integral function of Sajar's maintenance technician position. In his February 17, 2004, letter to Sajar, Dr. Altemus opined that "Mr. Daugherty would be able to successfully complete *the duties commensurate with the job description* provided me. But, because of the significant medication taken on a daily basis (both in type and strength), I do not feel comfortable in approving this man's reemployment at this time." (Emphasis added.) The letter indicates that, based upon his concerns about the risk of impairment that Daugherty's medication levels posed with respect to operating dangerous machinery, Dr. Altemus viewed plaintiff as being unfit to perform the essential functions of one particular job – maintenance technician at Sajar. Dr. Altemus's deposition testimony likewise reflects that he did not consider Daugherty to be broadly unsuited for other positions beyond that of maintenance technician for Sajar:

> Q. So would it be accurate to say that you concluded that somebody who was taking this level of medications would, per se, be unable to perform *this particular job*?
>
> A. No, that's not the gist of this at all. The gist is that he could do the job; however there is no way to tell what the next day would be. He does not have to give you all or nothing. You don't know when your perception is going to be off-base.
>
> Q. So would it be safe to say that anybody who is taking these medications, you would exclude from *this* job because of that?
>
> A. Absolutely. And it wouldn't even have to be these medications.

(Emphasis added.) In response to questions from plaintiff's counsel, Dr. Altemus further explained:

> Q. What aspect of the job did you feel prevented him from being able to safely perform it?
>
> A. The fact that his job description says that he has to work with power tools, milling machines, forklift truck[s], bandsaws, welders, drill press, and overhead cranes. Any one of those can kill you.

> Q.    So eliminating those would have made it acceptable for him to continue in the job?
>
> A.    I don't know.  It would depend on what the description would be of his job, if you eliminated all those.

As this testimony makes clear, Dr. Altemus assessed Daugherty's medical condition and capabilities only within the boundaries of the job description pertaining to Sajar's maintenance technician position.

Independent of Dr. Altemus's medical evaluation, which does not substantiate Daugherty's contention that the doctor found him to be substantially limited in the major life activity of working, there is no evidence that Sajar's decisionmakers who interacted directly with plaintiff – namely, Alexander and Cozzone – believed that he was unable to undertake a broad class or range of jobs due to his back condition.  From his own perspective, Alexander, who had the ultimate authority to terminate plaintiff's employment, testified that "[t]he way I interpreted [Dr. Altemus's opinion] was the medication he was taking was making him unsuitable for employment, *doing and performing the function of his job*."  (Emphasis added.)  Both Alexander and Cozzone informed Daugherty that if his medication levels were reduced or the medication eliminated completely, Sajar would consider recalling him for the next available maintenance technician position.  They therefore asked for documentation from Daugherty's physician confirming either a reduction in dosage or elimination of these narcotics altogether, but Daugherty failed to comply with Sajar's request, despite indicating in his March 18, 2004, statement to Cozzone that Dr. Franklin had already reduced the doses.

In sum, the evidence shows, at most, that Sajar believed that Daugherty's back condition and current medication levels precluded him from performing the dangerous machinery functions required of the particular job of maintenance technician at Sajar, but did not regard him as unable to perform a broad class or range of jobs in the maintenance field or other categories of employment.  Such evidence does not suffice to establish a prima facie regarded-as-disabled discrimination claim under the ADA and OCRA that implicates the major life activity of working.  *Sutton*, 527 U.S. at 492; *see also Schuler v. SuperValu, Inc.*, 336 F.3d 702, 705 (8th Cir. 2003) (affirming dismissal of ADA regarded-as-disabled claim brought by prospective employee with epilepsy where evidence showed that defendant employer "determined only that [the plaintiff] is precluded from performing the functions necessary to a specific job in its warehouse," but there was "no evidence to suggest that [the defendant] viewed [the plaintiff] as unable to perform other manual labor positions or even other warehouse positions."); *EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 76 (2d Cir. 2003) (affirming summary judgment as to regarded-as-disabled claim under the ADA where the defendant employer refused to hire certain applicants for over-the-road truck driving positions because they used a category of medications known to have side effects that might impair driving ability, and the record "only shows that [the defendant] saw the applicants as unfit to perform a job for which they were seeking applicants:  long-distance, freight-carrying, tractor-trailer driving," and not a class or broad range of other truck driving jobs.).

We therefore affirm the district court's order granting summary judgment in favor of Sajar with regard to Daugherty's state and federal disability discrimination claims, in light of Daugherty's failure to demonstrate adequately that Sajar regarded him as disabled from the major life activity of working.

## IV.

In his second assignment of error, Daugherty argues that the district court erred in dismissing his FMLA retaliation claim.  We agree.

Under the FMLA, a qualifying employee is entitled to up to twelve weeks of unpaid leave each year if, *inter alia*, the employee has a serious health condition that makes the employee unable to perform the functions of his position. *Walton*, 424 F.3d at 485 (citing 29 U.S.C. § 2612(a)(1)(D)).[4] When the FMLA leave period has expired, the employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1).

We have recognized two distinct theories of recovery for violations of the FMLA: (1) the so-called "entitlement" or "interference" theory, stemming from 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or attempt to exercise, any right provided under [the FMLA]"; and (2) the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2), which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by [the FMLA]." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). Under the latter theory, as pleaded in this case by Daugherty,

> the FMLA . . . affords employees protection in the event they suffer retaliation or discrimination for exercising their rights under the FMLA. Specifically, "[a]n employer is prohibited from discriminating against employees . . . who have used FMLA leave," nor can they "use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c). This prohibition includes retaliatory discharge for taking leave.

*Arban v. West Publ'g Co.*, 345 F.3d 390, 403 (6th Cir. 2003).

An employer's motive is an integral part of the analysis "because retaliation claims impose liability on employers that act against employees specifically *because* those employees invoked their FMLA rights." *Edgar*, 443 F.3d at 508.

An FMLA retaliation claim based solely upon circumstantial evidence of unlawful conduct is evaluated according to the tripartite burden-shifting framework set forth in *McDonnell Douglas*. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). A plaintiff must typically make a prima facie showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id*. However, when such an action is based upon direct evidence of discrimination – i.e., "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions" – a plaintiff need not proceed under the *McDonnell Douglas* analysis. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (internal citation and quotation marks omitted). Instead, as we explained in *DiCarlo*:

> [D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. The evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [the FMLA], but also that the employer acted on that predisposition. Finally, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.

---

[4] A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

*Id.* (internal citations and quotation marks omitted).

In the instant case, the district court analyzed Daugherty's FMLA retaliation claim pursuant to the *McDonnell Douglas* burden-shifting framework appropriate for circumstantial evidence cases. The court "assume[d] plaintiff has presented enough evidence to show an issue of fact as to whether the prima facie case has been established," but concluded that Sajar thereafter asserted legitimate reasons for its adverse decisions, which Daugherty in turn failed to show were pretextual in nature. *Daugherty*, 2006 WL 3228761 at *9.

Upon our review of the record, however, we conclude that the district court erred in utilizing the indirect evidence approach where there exists direct evidence of discrimination. As the district court itself acknowledged, one allegation that is central to Daugherty's FMLA retaliation claim is his contention that Alexander threatened him that if he took his final FMLA leave, he would not be allowed to return to work. At his deposition, Daugherty testified that "Ron told me, at the very end, if I took that FMLA [leave] for that period of time [four to six weeks] there would not be a job waiting for me, when I returned." Daugherty asserts that this threat was borne out when, in fact, he was never allowed to return after the leave of absence.

Clearly, this unambiguous comment, which we must take as true at the summary judgment stage, constitutes direct evidence that Daugherty's termination was motivated by unlawful, discriminatory animus. Alexander was Daugherty's immediate supervisor and a decision maker at Sajar. A fact finder would not be required to draw any inferences to determine that Alexander retaliated against Daugherty when Alexander explicitly threatened such retaliation and the threat – that Daugherty would not have a job waiting for him when he returned from leave – was realized. *See DiCarlo,* 505 F.3d at 415-16 (decision-making supervisor's remarks to Italian-American employee that he was a "dirty wop" and that there were too many "dirty wops" working at facility, followed two weeks later by supervisor's termination of employee, constituted direct evidence of national-origin discrimination); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 873-74 (6th Cir. 1991) (affirming district court's determination that direct evidence of discriminatory retaliation under Title VII existed where the plaintiff nurse produced evidence of conversations in which managers at the defendant hospital told her that her prior sex-discrimination suit was factor in denial of limited privileges to work at the hospital). Alexander's alleged threat to Daugherty does not indicate merely a general bias against employees taking FMLA leave, but rather establishes a clear connection between Daugherty's last FMLA leave and Sajar's decision to discharge Daugherty from his employment.

The present circumstances are distinguishable from other cases in which we have held that general, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus. *See, e.g., Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524-25 (6th Cir. 2007) (evidence that supervisor removed employee from account because he was "too old" did not constitute direct evidence that age discrimination motivated employee's termination); *Rowan v. Lockheed Martin Energy Sys.*, 360 F.3d 544, 548-49 (6th Cir. 2004) (employer's nebulous remarks about general need to lower average age of workforce and stray comment that "the older people should go, bring in some new blood," made years before employees' termination, were not direct evidence of unlawful age bias); *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir. 2000) (in context of weight discrimination claim, employer's references to "weight limits" and "Burger Boy" nicknames deemed not tantamount to direct evidence of discrimination where there was no evidence to connect the alleged prejudice against heavier individuals with the decision to fire employee); *Minadeo v. ICI Paints*, 398 F.3d 751, 763-64 (6th Cir. 2005) (supervisor's general remark about the plaintiff's age "[did] not even approach the standard required for a plaintiff to successfully present direct evidence of an employer's discriminatory motive" in age discrimination claim); and *Johnson* v. *Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (grocery store manager's alleged comment about potentially

detrimental effect on business of having an African-American co-manager and remark as to African-American plaintiff's lack of ability and intellectual shortcomings did not constitute direct evidence that manager's decision to discharge employee was motivated by racial animus).

Because Daugherty has produced direct evidence of improper motive, the burden shifts to Sajar to prove by a preponderance of the evidence that it would have made the same decision to discharge Daugherty absent the impermissible motivation. Having reviewed the evidence, we conclude that the question whether Sajar has met this burden is, under the circumstances, for the trier of fact to decide. Although Sajar has proffered evidence that supports its argument that "it was Plaintiff's stubborn refusal to provide legitimate medical confirmation of the reduction in his medications, not any discriminatory action by Sajar . . . that prevented him from returning [to work]," a genuine issue of material fact exists regarding whether Sajar used the requirement that Daugherty undergo a physical examination by Dr. Altemus, and his resultant medical conclusions, as a subterfuge for Daugherty's retaliatory discharge.

For its part, Sajar argues that Alexander's decision to recall Daugherty within four months of his layoff negates his claim of retaliation. Sajar notes that it never engaged in any adverse employment action against Daugherty following his prior multiple FMLA leaves and contends that there was a legitimate reason for terminating him after his November 2003 leave. It is undisputed that Sajar experienced a downturn in business, made the legitimate decision to lay off part of its workforce, and selected plaintiff to be laid off because he was the least senior maintenance technician. When the layoff ended and there was a vacancy to be filled in Daugherty's former position, he was notified of the opening by Sajar, but was required to take a physical examination because of his history of back problems and defendant's immediate need for a maintenance technician.

Sajar asserts that it had a reasonable basis for questioning whether Daugherty was able to perform his job duties at the time of the recall. Plaintiff was not returning directly from medical leave; instead, he had been placed on layoff status for over one month as part of an economic downturn. Daugherty's back condition was, by his own admission, unpredictable and episodic. Consequently, because he was placed on layoff status at the same time that his FMLA leave ended, Alexander and Cozzone were unsure whether the two-month leave had resolved Daugherty's most recent aggravation of his back condition. Alexander testified that in light of the urgent need for a maintenance technician at the end of the layoff period, Sajar required the exam because the company "needed to know if we had to hire somebody else." Alexander explained his decision in the following manner: "[W]e don't know what Jim was doing while he was on layoff . . . if he was working, doing something else, and what his medical condition was. And he has a history of having a bad back, and what we wanted to make sure is . . . [that] he was physically able to return to work, when we needed him." Alexander further testified that because expediency was an issue, and Sajar often used Dr. Altemus for employee physicals, Alexander knew that Dr. Altemus was usually "on-call, when we need him." Therefore, Alexander asked Dr. Altemus "if he would see Jim rather quickly, because we were trying to get him back to work."

Sajar maintains that it chose not to rehire Daugherty because he did not submit written confirmation from Dr. Franklin that his medication dosages had been reduced. Sajar asserts that Dr. Franklin's terse note that Daugherty would be able to return to work on January 4, 2004, was written in November 2003 – when plaintiff began his FMLA leave – and therefore was not enlightening as to Daugherty's current capabilities. From Sajar's viewpoint, Daugherty held the key to his own rehire: while purportedly acquiescing in Sajar's suggestion that he have his medication dosages reduced and representing verbally that this had occurred, he refused to provide the requested documentation. Consequently, according to Sajar, Daugherty's inaction raised legitimate concerns about whether Daugherty was being truthful about his prescription drug use, and, therefore, plaintiff was discharged from employment in accordance with defendant's policy regarding layoff status.

Conversely, however, Daugherty has raised genuine issues of material fact on key points bearing on Sajar's burden of proof, such as whether Sajar actually knew about Daugherty's use of medications before his examination with Dr. Altemus, but never expressed concern about alleged safety issues prior to Daugherty's last FMLA leave; whether Dr. Altemus's medical opinion can be considered independent, or in reality preordained, given that he routinely served in the role of "company physician" for Sajar; whether Dr. Altemus properly took into account Daugherty's specific dosages of medication and the alleged tolerance Daugherty developed to the narcotics; whether Dr. Altemus accurately interpreted the PDR with respect to the safety of working with heavy machinery while taking the prescribed medications; and whether Sajar reasonably relied upon Dr. Altemus's recommendation, while discounting Dr. Franklin's opinion that Daugherty was fit to return to work.

Viewing the evidence in the light most favorable to Daugherty, we conclude that these material factual disputes preclude summary judgment in Sajar's favor on Daugherty's FMLA retaliation claim. Under the circumstances, it is appropriate for the trier of fact to resolve whether Sajar, in the face of direct evidence of discriminatory animus, has successfully met its requisite burden of showing that, absent any discriminatory motivation, it would have made the same decision to lay off and not rehire Daugherty. We therefore reverse the district court's contrary order granting summary judgment and dismissing Daugherty's FMLA retaliation claim.

V.

In sum, for the reasons stated above, we affirm the district court's grant of summary judgment on Daugherty's state and federal disability discrimination claims. We reverse the district court's grant of summary judgment on Daugherty's FMLA retaliation claim and remand for further proceedings consistent with this opinion.