**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 12a1186n.06**

**No. 11-2394**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
*Nov 19, 2012*
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| LEDDREW SMITH, JR., | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| CITY OF NILES, | ) WESTERN DISTRICT OF MICHIGAN |
| | ) |
| Defendant-Appellee. | ) |

Before: SILER, COLE and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Leddrew Smith complains that the City of Niles (Michigan) interfered with his statutory right to take medical leave under the Family Medical Leave Act by failing to promote him when his supervisor retired and by eventually firing him. The district court granted summary judgment to the defendant. We affirm.

I.

From 1989 to 2010, Smith worked for the City of Niles in its utilities department. As an engineering assistant in the records division, Smith assisted records engineer Steve Barnes with drafting, billing, mapping, inspecting water and electric projects, and designing water projects.

A car accident in 2001 left Smith with a back injury that partially disabled him. Smith's physician told the City that, for three to four years, Smith would have "1-2 day intermittent episodes of incapacity," and, even while at work, he would be unable to bend, lift more than thirty pounds or

walk more than thirty minutes. R.34-12 at 2–4. The City kept Smith in his position as an engineering assistant and reassigned some of Smith's more-physical work to other employees.

Steve Barnes retired in 2008. Rather than promote Smith or hire a replacement for Barnes, the city manager, Terry Eull, eliminated the position and distributed the work to other employees. The City used the saved money to add an employee to the information technology department. Two years later, Eull eliminated the records department, which at that time consisted of Smith and Jim Shipley. The City discharged both employees on April 13, 2010, giving them similar severance packages.

Smith sued the City in federal court, raising claims under the Family Medical Leave Act, 29 U.S.C. §§ 2601–2654, and under Title VII. The district court granted the City's motion for summary judgment. Smith appeals only the court's resolution of his FMLA claim.

II.

As its name suggests, the Family Medical Leave Act regulates medical leave. It requires covered employers to give employees unpaid leave, without fear of losing their jobs, for up to twelve work weeks each year for (among other things) "a serious health condition that makes the employee unable to perform the functions" of the job. 29 U.S.C. § 2612(a)(1)(D). And it prevents employers from "us[ing] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). Smith complains that the City interfered with his FMLA rights in four ways, two of which arise from the Act's medical-certification requirements and two of which arise from its anti-retaliation requirements.

A.

Under the FMLA, employers may require employees to provide a physician's certification that the employee has a serious health condition and an explanation for the leave. *Id.* § 2613(a)–(b). The employer also may ask for recertifications on a "reasonable basis," *id.* § 2613(e), which usually means somewhere between thirty days and six months, *see* 29 C.F.R. § 825.308.

*Certification harassment.* Between 2002 and 2009, the City asked Smith to provide six separate certifications. These repeated requests, Smith says, exceeded the FMLA's limits and interfered with his right to medical leave. He is right about one thing: An unreasonable demand for recertification may interfere with FMLA rights. He is wrong about another: The City's requests all fit comfortably within the regulatory boundaries.

An employer may demand "a recertification of a medical condition every six months in connection with an absence by the employee." 29 C.F.R. § 825.308(b). And an employer may demand recertification within a shorter time, even as few as thirty days, if "[c]ircumstances described by the previous certification have changed significantly," including an "increased duration of absence." *Id.* § 825.308(c)(2).

Two of the City's recertification requests came within six months of a previous request. Smith's physician submitted a certification on May 4, 2009, and the City asked for recertification on October 30, 2009, just shy of six months later. Circumstances had changed significantly, though, between May and October 2009. Smith's apparent need to take absences due to back pain increased beyond what the May certification described. The City thus asked for an additional justification: "[O]n your last recertification . . . , your doctor estimated that you would need to be off work 1 day

- 3 -

every 3 months. [But from May 18 through October 12], you missed 6 days due to your back injury." R.34-14 at 2. Because Smith had taken six days of leave rather than the estimated two days, the City asked for a new recertification. This fact pattern largely mirrors the Department of Labor's benchmark example: "[I]f a medical certification stated that an employee would need leave for one to two days . . . and the employee's absences . . . lasted four days each, then the increased duration of absence might constitute a significant change in circumstances . . . ." 29 C.F.R. § 825.308(c)(2). As the example suggests, an FMLA certification does not provide a no-questions-asked pass for employees to take time off whenever and for however long they wish. If an employee desires more time off than described in the prior certification, the employer may require updated information from a physician. That is all that happened.

The City also asked for recertification on March 17, 2010, four months or so after a November 2009 certification, and did so for similar reasons: changed circumstances. In early March 2010, Smith sought a change in his working conditions to accommodate a new physical limitation—"no repetitive bending or twisting at the waist." R.42-4. The City responded with a request for recertification because the new limitations "were not listed" on the previous certification. R.42-5. That is the epitome of a reasonable recertification request.

*Work restrictions.* Smith complains that utilities manager Jim Lehmkuhl failed to respect his work restrictions by requiring him to pick up the department's mail from the post office. It is not clear, as an initial matter, what provision of the FMLA Smith means to invoke with this claim. Smith, for his part, does not tell us, and a quick perusal of the statute does not readily show one. The FMLA grants "12 workweeks of leave" in certain situations, including if the employee has "a serious

health condition." 29 U.S.C. § 2612(a)(1)(A)–(E). And it guarantees qualifying employees the right "to be restored by the employer" to their previous jobs or to equivalent ones, *id.* § 2614(a)(1), to keep any accrued employment benefits upon returning from leave, *id.* § 2614(a)(2), and to maintain coverage under the employer's group health plan, *id.* § 2614(c)(1). In contrast to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the FMLA does not appear to have a freestanding reasonable-accommodations provision.

Be that as it may, the *dispositive* flaw in Smith's argument is that it turns on an unsupported factual premise. Picking up the mail exceeded his work restrictions, Smith complains, because the mail weighed more than the thirty pounds his physician authorized him to carry. But any such problem was one of Smith's own making. Lehmkuhl told Smith he could separate the mail into smaller (less-than-thirty-pound) loads and take two trips if need be, and Smith presents no evidence that such an approach would exceed *any* restrictions. Smith acknowledges the point, eventually, in his deposition:

> Q: And when you went to get the mail, did you go to the post office first?
> A: I went to—I went upstairs, I went to city hall, I went to the post office. I went back to city hall, and then I came back to the utilities department.
> Q: How many trips did you make?
> A: One.
> Q: Okay. So you picked up all the mail and brought it all in one trip?
> A: Yes.
> Q: You didn't make any attempts to make a couple of different trips to guarantee that it wasn't in excess of 30 pounds?
> A: There was no way for me to know what 30 pounds was. There was no way to measure it.
> Q: You could have divided it in half just to, and made that extra trip just to be cautious, couldn't you?
> A: I could have probably went back 100 times and got one piece of mail at a time too.
> Q: Would you have done that?

A: I could have.
Q: Okay.
A: But I didn't.
Q: Did you think of doing that?
A: No. I don't think that would be real productive.
Q: Well you could have made two trips?
A: I could have made several trips.
Q: And you could have made two?
A: I could have made twenty.
Q: But you decided to make only one trip?
A: Yes.
Q: Do you have any idea how many pounds the mail weighed that day?
A: None whatsoever.
Q: Okay.
A: There was no way to measure or weigh the mail that Jim Lehmkuhl told me to go and retrieve.
Q: In looking at the mail, did it seem to you that it was close to 30 pounds?
A: I can't look at a box full of mail and tell you what it weighs, sir.
Q: So you didn't know how much the mail weighed?
A: Exactly.
Q: So you thought, I'll just bring it all in one shot and don't worry about making the multiple trips, right?
A: I did what Jim Lehmkuhl told me to and went and got the mail.
Q: Well, Jim Lehmkuhl told you if it was going to be too much, make more than one trip, right?
A: Yes.
Q: You didn't do that, did you?
A: No.

R.34-1 at 27–29. On this record, the district court properly rejected this claim as a matter of law.

B.

Smith separately raises two retaliation claims. While the FMLA does not use the word "retaliation" in its "Exercise of rights" or "Discrimination" provisions, the two sections readily cover retaliation-like claims:

> (1) Exercise of rights
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> (2) Discrimination
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(1)-(2).

Under the first section, the "prohibition against 'interference' prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c). Under the second section, a prohibition on "discrimination" against an employee for "opposing" unlawful practices by its terms covers some types of retaliatory practices.

Under either section, the *McDonnell Douglas* burden-shifting framework applies to retaliation claims based on indirect evidence (such as this one). *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Smith thus bears the initial burden of establishing a prima facie case: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). Once the claimant establishes his prima facie case, the burden shifts to the City to produce a legitimate, non-retaliatory reason for the adverse employment action. *Id.* The burden then shifts back to Smith to show that the City's stated reason amounts to a pretext for unlawful retaliation. *Id.*

*Retaliatory refusal to promote.*  Smith claims that the City retaliated against him when it declined to promote him after his supervisor retired.  Steve Barnes, the records engineer, supervised the records division until his 2008 retirement.  Terry Eull, the city manager (responsible for all of the City's hiring decisions), testified that in 2006 or so he decided he would eliminate the engineer position when Barnes retired.  Instead of hiring a new engineer upon Barnes's retirement in 2008, the City thus distributed Barnes's responsibilities among other employees in the utilities department.  This sequence of events, Smith claims, amounted to retaliation for taking FMLA-authorized medical leave.

Even assuming that Smith has established a prima facie case, he has not shown pretext.  His theory is that the City eliminated Barnes's position in order to avoid promoting a medical-leave-taking employee.  But to support this theory, he pushes the evidence beyond inferences that it will reasonably sustain.  His key piece of evidence is Steve Barnes's statement that Jim Lehmkuhl said "he would be crucified" if he gave Barnes's job to Smith despite his "persistent absences from work."  R.44-5 at 8.  This shows too little and too much.  It shows too little because Lehmkuhl did not make the decision to eliminate Barnes's position; Eull did.  And it shows too much because Lehmkuhl's statement related to concerns about Smith's absences *in excess* of those he was entitled to take under the FMLA.  In 2006, for example, Lehmkuhl bemoaned Smith's "terrible" "work attendance," noting that "[h]e has been employed by the City for over 17 yrs. and has . . . averaged 14.35 sick days per year.  He has been employed since 1989, so all the absence time can't be attribut[able] to the vehicle accident in 2001."  R.40-3 at 2.  Attendance, in short, was an issue long before the 2001 accident.  Catherine Jackson, a human resources employee, also testified that Smith

had missed work well in excess of the leave his physician had certified.

Smith presents nothing indicating that the City was responding to his FMLA-authorized leave. And the City, by contrast, has shown that Barnes's position was unnecessary, that his job responsibilities could be distributed, and that the City could use the surplus to create a needed position in information technology. Smith's failure-to-promote claim fails as a matter of law.

*Retaliatory discharge.* Smith's discharge claim fares no better. The City shut down the records division in April 2010, eliminating two positions—one belonging to Smith and the other belonging to an employee who never took any FMLA leave. According to Eull, he decided in 2010 to eliminate the records division of the utilities department as part of an ongoing workforce reduction that resulted in the elimination of twenty-four jobs between 2005 and 2010. The utilities department in particular had been losing money due to reduced customer usage and two large water projects that had cost millions of dollars. In deciding which positions to eliminate, Eull considered the relative feasibility of distributing responsibilities to other employees, and based his decision on the practical reality that "the records division did not provide a direct service" to utilities customers, R.34-5 at 17. The district court relied on these facts, as well as the undisputed fact that the City eliminated *both* positions in the records department—including one belonging to an employee who took no FMLA leave—in deciding that the reduction in force was not a pretext for Smith's firing.

Smith does not directly challenge the district court's decision, specifying no mistake in its analysis. For that reason alone, the claim must fail. Even if we give the brief the most charitable of readings, it reveals three potential pretext arguments that are themselves deficient: (1) he mentions financial reports for 2005–2009 from the utilities department showing that the utilities

department was not struggling financially; (2) he remembers Eull calling a department meeting in February 2009 where he told utilities employees the City was financially healthy and faced no foreseeable layoffs; and (3) Steve Barnes says that Lehmkuhl told him that Smith "could be terminated" because "he couldn't do his job." R.44-5 at 8.

Even aside from the absence of any sustained argument as to how these observations relate to his claim, these pieces of evidence do not raise a genuine issue of material fact about pretext. First, the financial reports back up the economic imperative for a workforce reduction. The 2007 and 2008 reports show substantial decreases in the water department's net income. It decreased 84% in 2007 and 881% in 2008. Second, whatever Eull told the utilities employees at the 2009 employee meeting cannot overcome the concrete reality that the City eliminated twenty-four positions during its reduction in force. Third, the Barnes statement is irrelevant because Eull made the decision to eliminate the records division.

III.

For these reasons, we affirm.