**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 10a0160n.06**

**No. 09-3168**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**Mar 15, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| Teri J. Williams, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| PVACC, LLC, dba Pine Valley Care Center, aka | ) | |
| CommuniCare Health Services, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SILER, ROGERS, and McKEAGUE, Circuit Judges.

ROGERS, Circuit Judge.  Plaintiff Teri Williams's employment at Pine Valley Care Center was terminated after she ceased working one afternoon at approximately 2:05 p.m. but waited in the break room until 2:28 p.m. before clocking out.  Williams, who is African-American, alleges that her termination was racially motivated and suggests that a discriminatory intent on the part of Pine Valley can be discerned from the company's more favorable treatment of a Caucasian employee, Joy Hefflefinger.  Pine Valley did not terminate Hefflefinger's employment despite her lengthy record of workplace misconduct of various types.  The district court granted Pine Valley's motion for summary judgment, finding that Williams had failed to present a prima facie case of race discrimination.  We uphold the district court's judgment on the alternative ground that Williams has not produced sufficient evidence to show that Pine Valley's legitimate, nondiscriminatory justification for terminating her employment is a pretext for racial discrimination.

Defendant PVACC, LLC, operates the Pine Valley Care Center nursing facility (Pine Valley) in Richfield, Ohio. Pine Valley hired plaintiff Teri Williams, who is African-American, to work in that facility as a dietary aide in 1996. Both parties agree that Williams was a good employee from 1996-2005; she was promoted—and designated employee of the month at least once—during this time. Her 2003 promotion was to dietary supervisor, a position in which she alone reported directly to the director of dietary services, who was the head of the department. In late 2005, Director of Dietary Services Lorraine Nestor was terminated for poor performance. Pine Valley designated Williams interim director of dietary services at that time. In January, 2006, Pine Valley hired Irene Millberg as director of dietary services, and Williams returned to her dietary supervisor duties.

The working relationship between Williams and Millberg was strained. Williams believed that the working conditions at Pine Valley deteriorated under Millberg's leadership. Specifically, Williams testified that (1) Millberg undermined Williams's attempts to supervise the other employees; (2) evening-shift employees did not complete "prep work" such that the morning-shift employees, like Williams, had more work to do; (3) other employees were taking excessive smoking breaks; and (4) Millberg relieved Williams of certain duties. Part of the problem regarding the prep work was caused by the reduction, in early 2006, of evening-shift staffing from three to two employees. Williams acknowledged this but still believed that the evening-shift employees were not completing their share of the duties. She was particularly displeased with one Caucasian cook,

Joy Hefflefinger.[1]  After a discussion with Hefflefinger, Williams reported the prep work issue to

Millberg, who stated that she would take care of the problem.  Williams testified that, even after this,

the prep work problems worsened, but Williams also stated that she did not directly attempt to

discipline Hefflefinger or any other employee regarding prep work.

The smoking break problem was apparently a long-standing one.  Williams identifies

Hefflefinger and her fellow evening-shift employee Jason Clark as particularly bad offenders.

Williams was not able to supervise these employees consistently, however, because she was not

present during the evening shift.  In June, 2006, the facility conducted an in-service meeting for all

employees addressing the issue of smoking breaks.  Regarding the allegation that Millberg relieved

Williams of her supervisory duties, Williams identified only one job duty from which she was

partially relieved:  ordering groceries.  She reported that part of this duty was reassigned to

Hefflefinger.

Hefflefinger testified that, prior to the reduction in evening-shift staffing, she and Williams

were not on bad terms.  She corroborated Williams's displeasure with the failure of the evening-shift

employees to complete the prep work after the reduction in evening-shift staffing.  In Hefflefinger's

words, at that time Williams "became very mean."  On July 1, 2006, Millberg gave Williams

"Corrective Counseling" for "Unacceptable Work Performance" regarding Williams's need to

improve her "positive attitude, teamwork, [and] communication with [Millberg] [and] staff."  The

---

[1] Hefflefinger's deposition transcript states that Hefflefinger's current full name is Joy
Hefflefinger Rhines.  Consistent with the other documents in this case, this opinion will refer to Ms.
Rhines as "Hefflefinger."

corrective counseling report warned that "failure to not [sic] perform supervisor job duties may result in losing supervisor position which may result in losing employment." Williams admits that one basis for the corrective counseling was her decision, after Millberg was hired, to cease engaging in conversations with other employees about matters not directly related to work.

Two disputed incidents led to Williams's demotion and the subsequent termination of her employment. On July 20, 2006, Millberg was absent from work while her husband was in the hospital following a heart attack. Dietary Aid Andrea Jensen reported in a signed statement to Pine Valley management that, when she asked Williams about the condition of Millberg's husband, "Williams said that she was unsure and that she felt like [Millberg] should be here with us rather than in the hospital with [her husband] and that she had it coming to her. She said it in a nasty way . . . ." Hefflefinger corroborated this account to management. As a result of this alleged incident, Williams was given corrective counseling and relieved of her supervisory duties. The July 26, 2006, corrective counseling report warned that the "next incident will result in [suspension, termination, or both]." Williams disputes the substance of the claims made by Jensen and Hefflefinger, but she does not dispute that these claims were reported to management. On August 28, 2006, Cook Judy Cunningham reported to management that Williams had ceased working at 2:05 p.m. and had sat in the break room until 2:28 p.m. before clocking out for the day. Hefflefinger corroborated that, at 2:15 p.m. that day, Williams was sitting in the break room. After an investigation, Pine Valley terminated Williams's employment. Williams admits that she ceased working that day at 2:05 or 2:08 p.m., but she claims that after this, she took a bathroom break before taking a fifteen-minute

break to which she was entitled. That break was scheduled to occur sometime in the morning, but Williams testified that she had not been able to take it at that time because of work demands. No employee replaced Williams as dietary supervisor, and no one was hired to take on Williams's job responsibilities after Pine Valley terminated her employment.

Hefflefinger, whose employment was not terminated, also had a checkered work history. Among other things, Hefflefinger twice received corrective counseling, once for leaving a roast in an oven cooking overnight and once for leaving a steam table on overnight. She repeatedly failed to clock in or out; after ten such "missed punches" between September and November, 2005, written counseling warned Hefflefinger that three more missed punches before the end of that year would result in a one-day suspension. This counseling and warning generally followed Pine Valley's written procedures regarding missed punches.[2] Hefflefinger was tardy seven times between October and December, 2005; written corrective counseling warned that one additional incident before September 27, 2006 would result in a written warning. She also had six unexcused absences in the six months prior to May 31, 2006. Pursuant to policy, a seventh absence would have resulted in written counseling, an eighth in a final warning, and a ninth in termination. Finally, Hefflefinger was among the employees who were accused of taking excessive smoking breaks.

Williams sued Pine Valley in Ohio court in November, 2007, alleging retaliation and age discrimination. Pine Valley removed the case to federal court because the age discrimination claim

---

[2] The policy actually called for written counseling after seven missed punches within a six-month period, and then a one-day suspension after ten missed punches in a six-month period. In no event did the policy call for termination for missed punches.

arose in part under federal law. Williams later amended her complaint to include claims of race discrimination, sex discrimination, and wrongful termination. Williams voluntarily dismissed the wrongful termination and retaliation claims. The district court then granted Pine Valley's motion for summary judgment, finding that Williams had not made out a prima facie case of sex, race, or age discrimination. The district court reasoned that Williams had failed to make out a prima facie case because she was not replaced by a person outside a protected class and because her misconduct prevented her from being similarly situated to any employee who received more favorable treatment. Williams now appeals, arguing that she made out a prima facie case of race discrimination under both Title VII and Ohio Revised Code § 4112.02, that Pine Valley's proffered justifications for her discharge are a pretext for discrimination, and that she still has a live disparate impact claim.

Pine Valley has produced evidence of legitimate nondiscriminatory reasons for terminating Williams's employment—her deliberate failure to clock out after being warned that her next incident of misconduct could result in suspension or termination—and Williams has not produced sufficient evidence to show either that these reasons did not actually motivate her discharge or that they were insufficient to motivate the discharge. Assuming for the purposes of this opinion that Williams is able to make out a prima facie Title VII or Ohio Revised Code § 4112.02[3] claim of race discrimination, "the burden shifts to the defendant to 'rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate,

---

[3] Ohio courts apply Title VII case law when analyzing cases brought under Ohio Revised Code § 4112. *Kocak v. Cmty. Health Partners, Inc.*, 400 F.3d 466, 471-72 (6th Cir. 2005).

nondiscriminatory reason.'" *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 129 S.Ct. 2343, 2352 (2009) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Here, Pine Valley has produced evidence that it terminated Williams's employment because she sat in the break room for twenty-five minutes on August 28, 2006, before clocking out. This misconduct occurred a bit more than a month after Williams was warned that further misconduct would lead to suspension or termination.

Pine Valley has met its burden to provide evidence of legitimate, nondiscriminatory reasons for terminating Williams's employment even though Williams disputes the substance of the reports of her misconduct. Pine Valley "is not liable if it acted upon an honest belief in its non-discriminatory reason and made a reasonably informed and considered decision." *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009). Williams has produced no evidence that Pine Valley did not honestly believe that the alleged incidents took place, and Pine Valley's investigations uncovered two witnesses willing to corroborate each event.

Williams further cannot show that Pine Valley's proffered reasons are a pretext for discrimination. Because Pine Valley has provided legitimate, nondiscriminatory reasons, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer*, 29 F.3d at 1083. To do so,

> the plaintiff is "required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge."

*Id.* at 1084 (emphasis omitted) (quoting *McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)). Williams asserts that she can produce sufficient evidence under prongs two and three of the *Manzer* test, but she cannot do so because her assertions would improperly require this court to evaluate Pine Valley's judgment that Williams's deliberate failure to clock out when she stopped working was more serious than either excessive smoking breaks or inadvertently missed punches.

Under our decision in *Ladd*, Pine Valley's more lenient treatment of excessive smoking breaks does not raise an inference of pretext. *See* 552 F.3d at 503. In *Ladd*, the plaintiff Ladd was dismissed for falsifying an injury report, which the company classified as a serious rule violation. *Id.* at 499. Ladd argued that this justification was a pretext for discrimination, as evidenced by the more favorable treatment of a different employee, Richert, who had not falsified an injury report but had violated other safety rules. *Id.* Similarly, Williams argues that taking excessive smoking breaks was equally serious as her waiting twenty-five minutes in the break room before clocking out. Williams also points to evidence in the record suggesting that Pine Valley did not vigorously enforce limits on employee breaks generally. In *Ladd*, we held that, "[e]ven though as outsiders, we may regard safety violations as severe as dishonesty, it is within the company's business judgment to treat differently-situated parties differently." *Id.* at 503. Noting that courts "look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's motivation and intent," we held that, because the two parties were not similarly situated in that they had violated different rules, we could not "adjudicate the intent of the employer" based on the comparison of Ladd and Richert. *Id.* Likewise, the evidence presented by Williams regarding

smoking breaks is not sufficient to support an inference of pretext because it is within the business judgment of Pine Valley to treat Williams's actions more seriously than excessive smoking breaks.

This conclusion is warranted even though the final incident precipitating Williams's termination may not have been particularly egregious in the context of Pine Valley's workplace. Williams produced evidence that Pine Valley did not generally enforce its rules concerning break times rigorously, though perhaps employees were expected to be more circumspect following the July, 2006, in-service meeting on breaks. Still, the relative harshness of Williams's termination does not raise an inference of pretext. In part, this is because the July 1, 2006, and July 26, 2006, corrective counseling reports placed Williams on a kind of probationary status.[4] This context undermines any claim that Williams's actions were insufficient to motivate her discharge. Additionally, merely exceeding the allotted break time during the workday does not clearly indicate an intent to be paid for time not worked in the way that finishing work, gathering one's belongings, and then waiting in a break room until the scheduled end of one's shift before clocking out does. Williams's actions were sufficiently unusual, and sufficiently improper, that one of her fellow employees reported them to management. Further, any implication that the disparate treatment of other breaks, such as smoking breaks, is indicative that Pine Valley's proffered reason is a pretext for discrimination is undermined by the fact that both Caucasian and African-American employees

---

[4] Williams cannot argue that other employees ought to have also been on similar probation because she has not produced evidence that any other employee engaged in conduct similar to the actions that precipitated these corrective counseling reports. *See Ladd*, 552 F.3d at 503. Williams's comment that Millberg deserved to have her husband suffer a heart attack is not equivalent to Hefflefinger's or Jensen's reporting that comment to management.

took allegedly excessive smoking breaks and by the evidence that all employees taking the allegedly excessive breaks received the same lenient treatment.

The other, Hefflefinger-specific allegations do not raise an inference of pretext for similar reasons. Hefflefinger's numerous violations of workplace rules included twice leaving cooking equipment on overnight, tardiness, unexcused absences, and missed punches. The differential treatment of Hefflefinger's failures to turn off equipment, tardiness, and unexcused absences was "within the company's business judgment to treat differently-situated parties differently." *Ladd*, 552 F.3d at 503. For two reasons, Hefflefinger's missed punches also do not raise an inference of pretext, even though such missed punches could result in inaccurate time records. First, as with the excessive smoking breaks, missed punches reflect an inadvertent, rather than a deliberate, failure to keep accurate time records. Second, Pine Valley set out the punishments for missed punches in the employee handbook, and those punishments did not include termination for missed punches. This policy was set out before Pine Valley knew whether the employees who violated this timekeeping requirement would be Caucasian or African-American, and thus enforcement of this policy of relative leniency cannot raise an inference of discrimination.

The limited statistical information presented by Williams regarding employment terminations does not support an inference of pretext because the termination and employment data do not refer to the same sample of employees and because there are too few observations. Relying on a chart provided by Pine Valley in its Motion for Summary Judgment, Williams asserts that Pine Valley has disproportionately terminated the employment of African-American employees. Pine Valley's chart

of terminations refers only to dietary services employees, and Williams's brief compares the percentage of terminated dietary services employees in a given year who were African-American to the percentage of employees of the Pine Valley facility as a whole who were African-American. This comparison is of no evidentiary value, particularly given the small sample size and the lack of expert statistical analysis. This evidence is therefore not sufficient such that a reasonable jury could find that Pine Valley's purported reasons for terminating Williams are a pretext for racial discrimination.

Because Williams did not plead a claim for disparate impact in her First Amended Complaint, she cannot raise such a claim now. In its entirety, Williams's claim of race discrimination stated:

31. Plaintiff incorporates as if realleged paragraphs 1 through 30.
32. Because race was a motivating factor and made a difference in the decision to treat Plaintiff differently with respect to her terms and conditions of employment, and to discipline, demote and discharge Plaintiff, Defendants violated Title VII and the provisions of Chapter 4112 of the Ohio Revised Code.

This paragraph alleges a disparate treatment claim. It clearly does not allege a disparate impact claim.

We therefore **AFFIRM** the judgment of the district court because Williams has not produced sufficient evidence by which a reasonable jury could conclude that Pine Valley's legitimate, nondiscriminatory reasons for discharging her are a mere pretext for discrimination and because she did not allege a claim of disparate impact in her amended complaint.