NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0087n.06

No. 10-3333

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Barbara Gambill, et al. | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| Duke Energy Corporation | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: ROGERS, COOK, McKEAGUE, Circuit Judges.

ROGERS, Circuit Judge. Following the 2005 merger between Cinergy Corp. and defendant Duke Energy Corporation, plaintiffs Barbara Gambill and Eric French were terminated during a reduction in force. Gambill and French, who were both over fifty years old at the time of their discharge, allege that Duke terminated them because of their age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq.[1] French further alleges that Duke retaliated against him for taking leave under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2612(a)(1)(D), and interfered with his receipt of early retirement benefits, in violation of

---

[1] Plaintiffs also allege violations of Ohio's age-discrimination laws, O.R.C. § 4112.02. Because the elements and burden of proof of the state age-discrimination claim parallel the ADEA analysis, *see McLaurin v. Fischer*, 768 F.2d 98, 105 (6th Cir. 1985), the court's resolution of plaintiffs' ADEA claims resolves the state-law discrimination claims, *see Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008).

the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140.[2]  The district court

granted Duke's motion for summary judgment, dismissing all of plaintiffs' claims, and plaintiffs

appealed.  This was proper because plaintiffs have not demonstrated a genuine issue of fact that

Duke's explanation for its actions was pretextual, that there was a causal connection between

French's termination and his FMLA leave, or that Duke interfered with French's retirement benefits.

**I.**

Gambill and French both worked in Cinergy's pre-merger legal department.  Gambill began

practicing law in 1985 and joined Cinergy in 1990.[3]  She focused on environmental law and assumed

the position of Senior Counsel in 1996, a position she held until her termination.  French began

working at Cinergy in 1977, and joined the legal department in 1999 as a general litigator after

obtaining his law degree.

Three years before the Duke-Cinergy merger, Marc Manly became Cinergy's General

Counsel; he then hired Catherine Stempien to head the litigation and environmental sections.  Upon

her arrival, Stempien allegedly excluded Gambill from various projects and meetings.  For example,

Gambill testified that she was assigned no role on a number of environmental suits, was not allowed

---

[2] Below, Gambill and French also alleged promissory estoppel, and breach of Ohio public policy.  However, plaintiffs have forfeited these claims by not pursuing them on appeal.  *See Miller v. Admin. Office of Courts*, 448 F.3d 887, 893 (6th Cir. 2006).

[3] Cinergy did not exist before a mid-1990s merger between Public Service Indiana and The Cincinnati Gas & Electric Company; however, for the purposes of simplicity, we refer to Cinergy and its predecessors as "Cinergy."

to speak at section meetings, stopped receiving legal updates from the environmental group, and was excluded from team building activities at a legal department retreat.

Further, Stempien and others at Cinergy allegedly made remarks that reflected a negative opinion regarding older employees. Stempien called French an "old-timer" and noted his graying beard. Stempien also made comparisons between the performance ability of younger and older employees, which included stereotypical assessments of Gambill's technological competence and willingness to learn. The comments were infrequent and occurred over a number of years.

Before the merger, French took leave to address various medical problems. In 2004, French missed approximately three weeks for back surgery. When French offered to return early from his FMLA leave, Stempien said "you can't come back to work, you're falling apart." When French did return in September 2004, French testified he had a "feeling" that Stempien's behavior had changed towards him. French testified that Stempien would "dump" work on him, showed greater interest in his whereabouts during the work day, and began closing her door when speaking with other attorneys. During the same period, French provided care for his mentally retarded brother and his father, who was diagnosed with Alzheimer's disease.

In May 2005, Duke and Cinergy announced their merger effective April 3, 2006. Shortly thereafter, a combined Duke-Cinergy integration team began evaluating staffing levels for the merged company. Stempien and a Duke employee, Paul Newton, co-chaired the legal department's integration team. They recommended that Duke create a new position entitled Environmental Health & Safety Counsel Midwest, which combined environmental legal work with health and safety legal

work. The team also recommended that Duke eliminate French's general litigator position, and reassign the matters he handled—such as foreclosures and small bankruptcies—to paralegals who would be assisted by outside counsel. These changes aligned the new legal department with Duke's prior organizational structure.

On January 18, 2006, Manly circulated a preliminary memorandum indicating that Duke planned to downsize the legal department by twelve attorneys and offering employees the opportunity to resign voluntarily with severance pay. The memo qualified that this staffing level was preliminary and that Duke expected "revisions to the design and staffing numbers as we develop a better understanding of our clients' organizations." It also listed "a number of criteria" that the integration team would use to select individuals for the new legal department: "performance evaluations," "ability to collaborate and work well with other lawyers and staff," "ability to communicate well with clients and build team consensus," and "subject matter expertise." In the combined legal departments, 13 attorneys voluntarily resigned, including four Cinergy attorneys and nine Duke attorneys. The option to voluntarily resign closed February 21, 2006, and neither Gambill nor French took the option.

Duke also allowed qualifying employees to opt for an early retirement pension enhancement under the Cinergy Corp. Non-Union Employees' Pension Plan. If an employee had attained the age of 52, was vested, and satisfied the Plan's "Rule of 85" – which required an employee's age and years of service to total 85 – he could qualify for early retirement. As part of the merger, Duke relaxed the Rule of 85 standard, granting an additional three points for age and three points for

service. French requested that the company grant him additional points or change the formula by which points were allocated, apportioning four points to age and two points to service. Duke was advised by counsel that it could not lawfully honor that request.

Following the close of the voluntary resignation window, Manly, Stempien and Newton began making personnel decisions. The team identified two candidates for the newly created EH&S Counsel Midwest position: Julie Ezell and Gambill. Ezell had joined Cinergy in 2000, after eight years of work in private practice. Starting in 2002, Ezell managed the largest litigation then affecting the company, litigation that involved the New Source Review (NSR), a permit process created by Congress as part of the Clean Air Act. A number of Duke employees believed that Ezell's NSR-based experience was of immediate and critical importance to the company.

As part of their decision, the integration team considered the performance reviews of both Ezell and Gambill. The team believed that in every performance year in which Ezell and Gambill were both reviewed, Ezell's performance rating was better than Gambill's. These annual performance evaluations included feedback from internal client contacts as well as peer reviews. Gambill's 2005 review did not include input from one of her primary internal clients, Debra Nispel, but did include input from another client, Bernard Huff.

Aside from the formal reviews, the integration team observed that Ezell was outperforming Gambill. As Manly later testified, he noticed that Ezell did well with the NSR case but also would have excelled if tasked with "smaller, more discrete matters." Manly also noticed that while Ezell's passion about not settling the NSR case "verged on being a little bit insubordinate," he "valued and

appreciated" her strong client advocacy. Gambill counters that Ezell had exceeded her budget and overused outside counsel.

The integration team also reviewed evidence of Ezell's and Gambill's collaborative ability. Stempien and Manly observed Ezell's management of the NSR case, and heard consistent peer reports that Ezell was easy to work with and helpful. Cinergy attorneys told the integration team that Gambill was unwilling to collaborate and that she failed to act as a liaison with state environmental regulators. Stempien later testified that "my colleagues had expressed dissatisfaction with [Gambill's] performance," and that they found her to be "unhelpful."

Regarding client communication and team building, clients and peers had praised Ezell's responsiveness and willingness to take responsibility. One internal client, Bernard Huff found that Ezell did not have any weaknesses. Another client noted that the only time Ezell was untimely in her responses was during the NSR trial, which was "a big case for the company." A third client found that, if anything, Ezell was over-responsive – the client did not like "talking to attorneys at 8:00 at night." By comparison, Stempien testified that at least one client had become so frustrated with Gambill's unresponsiveness that Stempien assigned the client a new attorney. A number of Duke employees explained to the integration team that Gambill was often unavailable, returned calls slowly, and failed to provide issue leadership to reach a decision. They believed that Gambill preferred to pass the decision to others to avoid responsibility. However, one internal client, Debra Nispel, testified that she thought very highly of Gambill and found her to be easy to work with,

knowledgeable, helpful, professional and responsive. Gambill testified that Ezell had problems with responsiveness and that she received extra help from Stempien on this issue.

The integration team also reviewed the relevant substantive expertise of Gambill and Ezell. Gambill testified that she was the subject matter expert in environmental law and that the younger litigators assigned to those cases lacked sufficient substantive knowledge. Gambill had worked for 20 years as an environmental attorney, and Stempien testified that Gambill was a subject matter expert in certain areas of environmental law. Ezell joined Cinergy in 2000 after having practiced law at various firms for approximately eight years. Cinergy initially hired Ezell as a litigator, and she began working on the NSR case in 2002. Gambill testified that although Ezell did dedicate a substantial amount of her time to the NSR case, the case involved an "infinitely narrow slice" of the law. Stempien, however, testified that the NSR case was the "single biggest litigation facing the company," which involved complex air pollution regulations – a substantive area that accounted for 80% of the environmental issues facing Duke. Ezell admitted that after the merger she had a "steep learning curve" because the company was going through a transition and there was a lot of change in the business. Because health and safety law issues had previously been assigned to labor and employment counsel at Cinergy, the two candidates were equal in this regard.

Based on these criteria, Newton recommended that Ezell fill the EH&S Counsel Midwest position role. Newton documented this decision on a selection decision worksheet that reflected the candidates' comparative strengths. Manly adopted Newton's recommendation.

After all the personnel decisions were completed, Gambill and French were terminated. Of the 83 total attorneys in the combined Duke-Cinergy legal department before the merger, 13 attorneys voluntarily resigned and Duke terminated an additional 7 attorneys. Duke retained all 22 attorneys under the age of 40, and retained 41 of the 48 attorneys over the age of 40 who had not already voluntarily resigned. Those who were terminated received a CD purportedly containing specific information required by the Older Workers Benefit Protection Act (OWBPA), 29 U.S.C. § 626 (f)(1)(H)(i) & (ii). The parties disagree whether the CD provided sufficient information in an understandable form.

Gambill and French sued in federal district court asserting various federal and state constitutional and statutory claims. The district court granted Duke's motion for summary judgment on all claims, including some that are not raised on appeal: promissory estoppel and breach of Ohio public policy.

The district court found that plaintiffs had made a prima facie showing of age discrimination, but had failed to show pretext. The prima facie cases were sufficient, according to the district court, because Duke employees made age-related comments about Gambill and French. The district court accepted Duke's proffered reason for terminating Gambill and French – the reduction in force – as legitimate and nondiscriminatory. Shifting the burden back to plaintiffs, the court required plaintiffs to show that their age was a "but for" cause of their termination, since finding a showing that age was a motivating factor was insufficient under *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009). Under this "but for" standard, the district court found that plaintiffs' proffered evidence did not

demonstrate that the RIF was pretext. The district court also rejected plaintiffs' disparate impact theory, because plaintiffs failed to articulate a "specific test, requirement or practice" and failed to proffer evidence showing the differentiation between workers was not based on reasonable factors.

The district court also granted summary judgment on French's ERISA and FMLA claims. The district court found that temporal proximity alone was insufficient to establish the ERISA claim because French failed to show that he was close to attaining benefits. With regard to the FMLA claim, the district court found that French failed to proffer any evidence other than his own feeling that his FMLA leave motivated his termination. Plaintiffs filed this timely appeal.

## II.

### A. Age Discrimination Claims

### 1. Legitimate, Non-Discriminatory Reason

For the purposes of this opinion, the court assumes that plaintiffs made a prima facie showing of age discrimination, shifting the *McDonnell Douglas* burden to Duke. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). With the burden shifted, a defendant must then proffer a "legitimate, nondiscriminatory reason" for the plaintiffs' terminations. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 492 (6th Cir. 2010). Duke has carried this burden. It is undisputed that when Cinergy merged with Duke, the combined entity engaged in a reduction in work force. During the resulting reorganization, Duke created a new position – Environmental Health & Safety Counsel Midwest – that combined environmental legal work with health and safety legal work. Gambill and Ezell were both candidates for this new position and Duke claims it selected Ezell to fill the position

based on several nondiscriminatory factors. Duke asserts that French's position was eliminated to align the new legal department with the Duke model. Because Duke proffered legitimate reasons for Gambill and French's involuntary separations, there is no genuine issue of material fact that the company has met its burden. *See, e.g., Smith v. Allstate Ins. Co.*, 195 F. App'x. 389, 395-96 (6th Cir. 2006).

**2.     Pretext**

Shifting the burden back to plaintiffs, Gambill and French have not raised a genuine issue of material fact that shows Duke's explanation "did not actually motivate the defendant's challenged conduct" *See Wexler v. White's Fine Furniture Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). Plaintiffs first argue that Gambill met her burden by showing that she was more qualified than Ezell. Plaintiffs then argue that the voluntary resignation of thirteen attorneys made Gambill and French's involuntary terminations unnecessary. Finally, Plaintiffs argue that French met his burden by showing that Duke did not save money by terminating him.[4] For the following reasons, these arguments fail.

---

[4] Plaintiffs also argue that the district court improperly evaluated the RIF for pretext, rather than analyzing Duke's reasons for terminating Gambill and French in particular. However, the district court evaluated both the RIF and the decision to terminate Gambill and French.

Further, plaintiffs claim that the district court improperly required them to *prove* pretext. This did not occur. Instead, the district court properly rejected plaintiffs' argument that they need only show that age is a motivating factor. The district court noted that an ADEA plaintiff must establish that age was a "but-for" cause of the employer's actions, citing *Gross*, 557 U.S. at 167; *Geiger v. Tower Automotive*, 579 F.3d 614, 620 (6th Cir. 2009).

### i.     Gambill's Qualifications

Taking into consideration evidence of Duke's nondiscriminatory reason for terminating Gambill, Gambill has not shown she was more qualified than Ezell. In choosing between Gambill and Ezell to fill the EH&S Counsel Midwest role, Duke considered certain selection criteria: (1) performance evaluations, (2) collaborative ability, (3) ability to communicate with clients and build team consensus, and (4) subject matter expertise. Each of these factors shows that Ezell was more qualified than Gambill, demonstrating Duke's lack of discriminatory intent.

First, Ezell's performance evaluations were consistently superior to Gambill's. Gambill argues that her 2005 review should be ignored because it omitted input from a client, Debra Nispel. However, Nispel's input was omitted for a nondiscriminatory reason: she was unavailable during the review period. Further, even in years where Duke included Nispel's evaluation, Ezell's performance reviews were still superior. Gambill also argues that the performance reviews are contradicted by Manly's testimony that Ezell was "insubordinate," but, Manly testified that he "valued and appreciated" Ezell's strong client advocacy. Moreover, Manly testified that Ezell capably fulfilled her NSR role, but also could "shine" on smaller projects. Accordingly, the performance reviews support Duke's finding that Ezell was more qualified.

Second, Stempien and Manly observed that Ezell's collaborative ability exceeded Gambill's. They observed Ezell's successful management of a large litigation and heard consistent peer reports that Ezell was easy to work with and helpful. In contrast, attorneys complained that Gambill was unwilling to collaborate, that she failed to act as a liaison with state environmental regulators, and

that she did not adequately share her substantive expertise. Stempien testified that, "[a] number of my colleagues had expressed dissatisfaction with [Gambill's] performance," and found her to be "unhelpful." Gambill offers no rebuttal evidence to this point.

Third, Ezell's ability to communicate with clients and build team consensus surpassed Gambill's. Ezell demonstrated strength in communication and issue leadership, and clients and peers uniformly praised Ezell's responsiveness and willingness to take responsibility. In fact, the very same "difficult" client that Gambill complains gave her a bad review, Bernard Huff, testified that Ezell did not have any weaknesses. In contrast, Stempien testified that the same client was so frustrated with Gambill's unresponsiveness that the client had to be directed to another attorney in the department. Duke employees testified that Gambill was often unavailable, returned calls slowly, and failed to provide issue leadership to reach a decision; her peers interpreted the latter as Gambill's willingness to pass the decision to others to avoid responsibility. In response, Gambill mischaracterizes the testimony of two witnesses, Janson and Pearl, as suggesting that Ezell was unresponsive. Instead, Janson testified that the only time Ezell was untimely in her responses was during the NSR trial, which Janson testified was "a big case for the company." Pearl testified that, if anything, Ezell was over-responsive – Pearl did not like "talking to attorneys at 8:00 at night."

Fourth, Duke concedes that Gambill had more experience in the field of environmental law; however, this does not detract from Ezell's "excellent" knowledge of the subject matter. Ezell had worked at an environmental boutique firm and managed the "single biggest litigation facing the company," which involved complex air pollution regulations – a substantive area that accounted for

80% of the environmental issues facing Duke. In addition, Ezell was "more familiar with the facts and witnesses [of the NSR case] than anyone else." Although Gambill had more experience than Ezell, the record demonstrates that the relative subject matter expertise is closer than what Gambill argues.

Given these factors, a jury could only conclude that Newton recommended that Ezell be the new EH&S Counsel based on demonstrable superiority when assessed against the selection criteria, with no regard for age. Newton's documentation of this recommendation on a selection decision worksheet that reflected the candidate's comparative strengths, combined with Manly's adoption of Newton's recommendation, reflects a deliberate process based on legitimate, rather than impermissible, criteria. Gambill has failed to show the decision "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *See Wexler*, 317 F.3d at 576.

Gambill's analogy to the situation in an unpublished district court opinion does not require a different conclusion. Citing *Erpenbeck v. Premier Golf Mgmt.*, No. C-1-05-419, 2006 WL 3390996, at *3 (S.D. Ohio Nov. 22, 2006), Gambill requests that the court disregard Duke's evaluations because Gambill cannot be required to prove "what was in the employer's mind." *Id.* *Erpenbeck* is distinguishable because it involved an employer who claimed he did not know the age of an employee, despite the employer's access to records showing the employee's birthday. *Id.* at * 2. Given the factual nature of that evidentiary dispute, the court sent the case to a jury for a

credibility determination. *Id.* Here, as detailed above, Duke has provided ample evidence that supports its decision, and there is no genuine factual dispute.

ii.     *Voluntary Resignations and Other Evidence*

The voluntary resignation of thirteen attorneys prior to Duke's termination of Gambill and French is not evidence of pretext. Gambill asserts that Manly's January 18, 2006 memo reflected a final determination of the legal department's size; therefore, she contends that Duke's goals were satisfied by the voluntary departures. However, Manly's memo was not a final determination of the legal department's size; in fact, the memo stated that further revisions were likely "as we develop a better understanding of our clients' organizations." Because a reduction in force following a merger is ordinarily an iterative process, Manly's memo could only be a preliminary indication of anticipated reductions. Further, plaintiffs' citation of the testimony of Tim Verhagen, then Vice President of Duke's Human Resources Department, does not change this conclusion. Verhagen testified that if a *hypothetical* company wanted a reduction in force of ten people, and ten people volunteered to resign, there would be no need for involuntary separations. However, Verhagen also noted that RIFs were usually intended to "achieve the optimal organization going forward," based on the skills and competencies needed in the new organization and not by the raw numbers of employees. Accordingly, even if Duke initially believed a twelve-attorney reduction in force was sufficient, the fact that it found it necessary to terminate an additional nine attorneys does not support a discriminatory inference.

Plaintiffs use a single paragraph to list evidence that similarly fails to show pretext: a purported pattern of hiring younger employees and the supposed OWBPA violation. Their perfunctory treatment of these arguments constitutes a waiver. *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007).

###### iii.      Cost Savings in Relation to French's Termination

The purported increase in costs following French's termination is not evidence that his termination was pretextual. French was terminated to align the new legal department with Duke's then-existing model, where paralegals and outside counsel performed the duties previously performed by French. Plaintiffs provide no evidence that this realignment increased costs. Even if the costs did increase, "[i]t is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized." *Norbuta v. Loctite Corp.*, 1 F. App'x. 305, 314 (6th Cir. 2001). At most, French has offered evidence that Duke did not make a prudent business decision, which does not support an inference that Duke's proffered reason for French's termination had no basis in fact, did not actually motivate the defendant's challenged conduct, or was insufficient to warrant the challenged conduct.

## 3. Disparate Impact

Gambill and French also fail in their disparate impact theory of discrimination because they did not plead disparate impact and, even if they did, plaintiffs' statistical evidence is not "of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question."

*Peace v. Wellington*, 211 F. App'x 352, 356 (6th Cir. 2006) (setting forth standard). First, the words

"disparate" or "impact" appear nowhere in the Second Amended Complaint, and plaintiffs did not

raise the theory until they filed their opposition to summary judgment. Gambill and French counter

that they alleged "Duke engaged in a pattern and practice of discrimination and that [plaintiffs']

termination allowed the retention of significantly younger individuals"; however, at most these

factual allegations support a disparate treatment claim and not a disparate impact claim. *See*

*Williams v. PVACC, LLC*, 369 F. App'x 667, 674 (6th Cir. 2010). The complaint makes no

allegation that Duke's RIF was "fair in form but discriminatory in operation," *Phillips v. Cohen*, 400

F.3d 388, 397 (6th Cir. 2005), but instead sets forth a case of disparate treatment.

Second, even if plaintiffs had pled a disparate impact claim, they fail to provide probative

statistical evidence. A plaintiff's statistical evidence cannot be merely a "simplistic percentage

comparison[]" with a "small sample size[]," but instead must meet the minimum standards of

statistical reliability. *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir.

2008).[5] Not only is Gambill and French's statistical evidence plagued with computational errors,

but it involves a simple percentage comparison of older and younger attorneys retained. Plaintiffs

assert that the Duke-Cinergy legal department had 83 attorneys before the merger. Thirteen of these

attorneys voluntarily resigned and Duke terminated an additional nine. Plaintiffs contend that Duke

retained only 64% of the attorneys over the age of 40, but retained all 22 attorneys under 40.

---

[5] The district court analyzed the statistical evidence in the context of the plaintiff's prima
facie case: "In addition, the Court finds that the retention of Ezell and the statistical data
regarding who was retained and who was terminated could reasonably support such an inference
[of prima facie discrimination]."

This calculation is not supported by the record. Plaintiffs identify nine terminated attorneys, but Duke ultimately retained two of these attorneys – Bill DuMond and Martin Rios – making the total number seven. Duke would have the court discount an additional three attorneys because they were purportedly "outside the scope" of the RIF; however, there is a discrepancy between the affidavit provided by Duke and the documents upon which plaintiffs rely. Therefore, interpreting the evidence in the light most favorable to plaintiffs, the total number of terminated attorneys is seven.

Gambill and French incorrectly calculate the percentage of older workers retained. When making this calculation, plaintiffs included 13 attorneys that took the voluntary severance package and, therefore, were not subject to the RIF. In contrast, for example, in *Gault v. Zellerbach*, No. 97-4238, 1998 WL 898831 at *2 (6th Cir. Dec. 16, 1998), we held that employees who accepted a voluntary retirement were not subject to a RIF. Excluding the 13 attorneys who took the severance package, Duke retained 41 of the 48 attorneys over the age of 40, or 85%. Even discounting Bill DuMond and Martin Rios, the percentage retained would be 81%.

Finally, the sample size of terminated employees is too small to make this statistical evidence probative. *Gault*, 1998 WL 898831 at *2 (rejecting sample size of six people); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (holding sample size of seventeen people was "suspect"). "[S]tatistical evidence is of much greater value in discrimination cases where large numbers of employees are involved and fewer subjective personalized factors are considered in determining whether an offer of employment is to be made." *EEOC v. New York Times Broadcasting Serv., Inc.*, 542 F.2d 356, 360 (6th Cir. 1976). Although a small sample size is not

fatal in and of itself, it is coupled with a relatively small discrepancy between the percentage of protected employees retained (85%) and the percentage of non-protected employees retained (100%). This would be inadequate even under the EEOC's rule of thumb for judging adverse impact: "[a] selection rate for any [protected group] which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded . . . as evidence of adverse impact." 29 C.F.R. § 1607.4(D). The failure to reach levels equivalent to this rule of thumb casts doubt upon the value of plaintiffs' evidence. Accordingly, plaintiffs' statistical evidence is insufficient to survive summary judgment on their disparate impact claim.

**B.      French's FMLA Claim**

French's claim under the Family and Medical Leave Act (FMLA) fails because he has not made a prima facie showing of a causal connection. To maintain a FMLA claim, a plaintiff must show that "a causal connection exists between the protected activity and the adverse employment action." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). French provides no evidence to link his termination to his previous absences. Instead, French relies on his subjective "feeling" that Stempien's behavior towards him changed after his return from leave in September 2004. French based this feeling on his perception that after his return, Stempien would "dump" work on him, showed greater interest in his whereabouts, and began closing her door when speaking with other attorneys. Such a subjective belief, no matter how genuine, is "insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). French counters that in 2004, he tried to return to work following leave and Stempien said, "you can't come back to work, you're falling apart." There is no evidence linking

this stray comment, in which Stempien told French to extend his leave, to the decision to terminate his employment. Further, the comment occurred two years prior to French's termination, and "[t]his Court typically [has] found the causal connection element [is] satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." *Dixon v. Gonzalez*, 481 F.3d 324, 334 (6th Cir. 2007); *see also Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (six months sufficient); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three months sufficient); *Smith v. City of Salem*, 378 F.3d 566, 571 (6th Cir. 2004) (less than a week sufficient); *but see Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two to five months insufficient). The cases French cites in response are inapplicable because they apply only in a specific factual scenario: reinstatement cases where the supervisor could not retaliate until plaintiff returned to her former position. *See, e.g. Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007); *Porter v. Cal. Dept. of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005); *Ford v. General Motors Corp.*, 305 F.3d 545, 552 (6th Cir. 2002). French's case is factually distinct from *Dixon*, *Porter* and *Ford* because at all relevant times his supervisors had the capacity to retaliate against him, but did not. Cinergy's decision not to retaliate during a two-year period eviscerates the purported temporal connection between French's FMLA leave and his termination.

## C. French's ERISA claim

French's claim under ERISA fails because he has not made a prima facie showing of "the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Pennington v. W. Atlas, Inc.*, 202 F.3d 902, 906 (6th Cir. 2000) (quoting *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997)).

French's case falters on the second element because he cannot show a causal link between the termination and the increased cost of his benefits, or show intentional interference. *Pennington*, 202 F.3d at 906.

The record does not support French's claim that Duke interfered with his attainment of a right because it is not clear how French could have qualified for the early retirement pension enhancement. Under Duke's retirement policy, employees qualified for the pension enhancement if their age added to the years of service equaled or exceeded 85. As part of the merger, Duke offered an early retirement option under which employees got an additional three points for age and three points for service, if the employee had reached the age of 52 and had volunteered to retire before the plan window expired. Because French did not volunteer, it appears on the record that he would not have been eligible for the early retirement enhancement even if he had been retained. Further, it appears French would have been too young to qualify for retirement, even if he had volunteered, because he did not turn 52 within the plan window. French appears not to have qualified for the early retirement option.

In any event, to the extent French complains that Duke did not make a special exception for him by awarding him more points or allocating his points differently, he fails to carry his burden. ERISA protects employees only from interference "with the attainment of any right to which such participant may become entitled *under the plan . . . .*" 29 U.S.C. § 1140 (emphasis added). This statute only protects entitlements that arise under the terms of a qualified pension plan, and does not require a company to alter its retirement plan on a case-by-case basis to accommodate those who do

not otherwise qualify. In fact, such ad hoc application of a retirement plan could have run afoul of

ERISA.

Further, the six-point benefit given to employees "eviscerate[s] any inference attributable to

temporal proximity as they have the effect of sweeping more employees into retirement, not fewer."

*Gambill v. Duke Energy Corp.*, No. 1:06-CV-00724, 2009 WL 2983055, at \*12 (S.D. Ohio Sept. 11,

2009). Duke did not deny employees retirement benefits, but instead offered a severance package

that granted retirement benefits to those that otherwise did not qualify. French complains that

Duke's plan was not sufficiently generous. Because he was not entitled to special treatment, French

has failed to show that his inability to avail himself of the benefit of the extra points constitutes an

ERISA violation.

## IV.

The district court's grant of summary judgment is affirmed.