NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0695n.06

**No. 13-3258**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Sep 08, 2014

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LOLETIA WILSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| | ) | |
| CLEVELAND CLINIC FOUNDATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

Before: COLE, Chief Judge; SILER and COOK, Circuit Judges.

**SILER**, Circuit Judge. Plaintiff Loletia Wilson appeals the district court's grant of summary judgment in favor of her employer, the Cleveland Clinic Foundation ("Clinic"), on a claim of gender discrimination arising out of a failure to promote and claims of retaliation based on her suspension and termination from work. For the following reasons, we **AFFIRM**.

**BACKGROUND**

Wilson sued the Clinic for employment discrimination under federal law (Title VII) and state law (Ohio Rev. Code § 4112.02). Counts One and Two of the complaint allege the Clinic discriminated against Wilson by failing to promote her to one of four newly-created Workleader positions because of her gender. Counts Three and Four allege the Clinic retaliated against Wilson by issuing her a three-day suspension for filing an EEOC charge in 2010. Counts Five and Six

allege the Clinic retaliated against Wilson by terminating her for filing a second EEOC charge in 2011. The district court granted summary judgment to the Clinic on all claims.

**1. Gender Discrimination - Failure to Promote**

The Clinic hired Wilson as a patient transporter in 1997. In late 2010, it created a new Workleader position and decided to hire four individuals to assume the role. More than 20 employees, including Wilson, applied for the position, and each applicant was interviewed. According to Jason Petty, manager of the transportation department for the second and third shifts, the Clinic reviewed each applicant's skill sets and qualifications. Petty and other supervisors collectively made the promotion decisions. They considered numerous employment factors and ultimately settled on Alphonso Roberson, Herbert Allen, Charles DeBerry, and Steven Knox. It is the selection of DeBerry and Knox that Wilson now challenges.

**2. Retaliatory Suspension**

Wilson filed her first charge of discrimination against the Clinic in December 2010, claiming gender discrimination in being passed over for the promotion to Workleader. On August 26, 2011, Wilson received a call to go to a patient's room to transport a deceased patient. Darlene Brooks was also assigned to this patient as the primary, or lead, transporter. Brooks and Wilson entered the patient's room together. After attempting the "halfway test" to gauge whether they could slide the patient from her bed to the morgue cart, the two transporters realized that the patient was too heavy. Brooks left the room to call for assistance. Then Wilson left the patient's room in order to request a sturdier cart and, in doing so, left the body unattended. While Wilson and Brooks were in the hallway speaking with a secretary, the deceased fell off the cart onto the floor.

On later investigation, Brooks said she told Wilson to remain in the room while Brooks sought additional help. The Clinic conducted an investigation and determined that Wilson should receive a three-day suspension, considering the severity of the incident, for failing to follow department policies and for taking actions detrimental to patient safety. The Clinic also determined that Brooks followed protocol when she left the patient's room to obtain further assistance.

## 3. Retaliatory Termination

Wilson filed her second charge of discrimination with the EEOC on November 4, 2011, alleging the impropriety of her three-day suspension in connection with the corpse incident. On February 6, 2012, Wilson was assigned to transport a patient from the radiation oncology ward. The patient had undergone surgery involving the placement of vaginal rods, and subsequently was sent for radiation after the procedure. According to Wilson, neither the hospital staff responsible for holding patients who were scheduled for transport nor any nurse participating in the transport had mentioned the vaginal rods. Wilson arrived outside the patient's room and was joined by a nurse assistant, Susetta Page. Wilson and Page entered the room together and waited approximately 15 minutes for nurse Stephanie Taylor to arrive. According to Wilson, after the three of them were in position to slide the patient onto a bed, Taylor abruptly walked off while the transfer was in process. Wilson had seen Taylor making a call on her hospital-issued phone—given specifically to nurses—as she was exiting the room. Wilson then instructed Page that the two of them could complete the move, and Page assisted in sliding the patient to the bed. Taylor thereafter reappeared, encountering Wilson near the doorway. Wilson asked if any more help was needed, to which Taylor responded "no." Taylor checked the patient after the transfer and confirmed that the vaginal rods were in place. Later, Wilson attended a meeting on February 8 with Mariselle Caraballo, manager

of patient transportation for the first shift, and Petty to discuss what had happened. Importantly, Wilson stated that her decision to initiate the transfer arose out of a belief that Taylor was not coming back; as a result, Wilson asked Page to help her in transferring the patient.

According to Taylor, when she entered the patient's room, both Wilson and Page were situated next to the patient with the draw sheet—which is laid underneath the patient—held ready in their hands. The bed and stretcher were locked and placed adjacent to each other. Taylor asked Wilson and Page to wait so that she could request additional help. Taylor proceeded to step away from the patient and placed a call to the front desk from behind a curtained area in the room. When Taylor returned, the patient had already been moved to the bed. Taylor also alleges that the patient later experienced pain and discomfort. Taylor reported Wilson to hospital administration, expressing her dismay over Wilson's conduct; Taylor asserted that the normal procedure when transferring a patient with vaginal rods is to lift, rather than slide, the patient off the gurney to the bed.

Based on Caraballo's and Petty's investigation, the Clinic terminated Wilson on February 13, 2012, "for her unacceptable job performance which caused or contributed to unsafe conditions or unsafe procedures as a result of her failing to abide by the nurse's instruction to wait for additional help and her decision to move the patient herself." The termination report states that Wilson failed to use good judgment, failed to follow department procedure, and that she admitted to hearing the nurse's instruction but chose to go against procedure because she thought she could perform the transfer without the additional help. Taylor and Page supplied written witness statements on February 13 and February 16, respectively, though each had been interviewed as part of the investigation the day after the incident.

-4-

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008).

## DISCUSSION

### 1. Gender Discrimination - Failure to Promote

As a threshold matter, when interpreting Ohio anti-discrimination law, the Ohio Supreme Court has held case law interpreting federal anti-discrimination law generally applicable. *See Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 672 (Ohio 1994). Absent direct evidence of discrimination, Title VII claims are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as subsequently modified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

#### A. Prima Facie Stage

To establish a prima facie case of gender discrimination based on a failure to promote, as called for at the first stage of the *McDonnell Douglas* analysis, Wilson must demonstrate: (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000).

The first and third prongs of the prima facie case can be addressed swiftly. There is no dispute that Wilson, a woman, is a member of a protected class. It is also clear that Wilson applied for the Workleader position and was interviewed by the Clinic but not ultimately selected. In

meeting the second prong, the Clinic agrees that Wilson satisfied the Clinic's objective qualifications.

In a failure to promote claim, the emphasis in the fourth prong is on the relative qualifications of the plaintiff and the employee who actually received the promotion. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240-42 (6th Cir. 2005). Here, there was insufficient evidence of Knox's and DeBerry's experience to permit a threshold weighing of each candidate's qualifications against Wilson's qualifications. *See Culver v. CCL Label, Inc.*, 455 F. App'x 625, 629 (6th Cir. 2012). Though Wilson had four years' additional experience compared to Knox and six years compared to DeBerry, all three candidates for Workleader possessed at least seven years' experience as transporters, which is beyond the minimum requirement specified in the job posting. But that is the extent of the comparison. Where a plaintiff "introduce[s] only the years of seniority" and little else, she has "c[o]me up short" with respect to her obligations at the fourth prong. *Id.* Wilson failed to produce evidence of the education history of Knox or DeBerry to confirm they at a minimum had earned a high school diploma. So too did Wilson fail to produce evidence of evaluations or written reviews to ensure that both Knox and DeBerry exhibited "good verbal communications skills to interact with patients . . . [and] nursing unit staff" and "the ability to understand and follow oral and written instructions," as required by the job posting. In sum, she did not present sufficient evidence for a reasonable trier of fact to conclude she was similarly qualified to Knox and DeBerry for the Workleader position.

## B. Nondiscriminatory Justification

Even if Wilson had provided adequate evidence to succeed at the prima facie stage (i.e., we assume that all candidates were similarly qualified because they all were considered and

interviewed), the Clinic articulated a legitimate, nondiscriminatory reason for not promoting her; namely, it selected more qualified candidates for the role. To rebut the presumption of discrimination, "the defendant must clearly set forth . . . the reasons" for not promoting the plaintiff, and that explanation "must be legally sufficient to justify a judgment for the defendant." *Burdine*, 450 U.S. at 255. Wilson had a long history of employee anecdotal notes and corrective actions, for both performance and productivity issues, which did not comport with the conduct expected of a Workleader. Knox, on the other hand, was very good with patients, was always willing to do extra work, took on added responsibility, exhibited good work performance, and excelled with customers. DeBerry displayed good work habits, leadership qualities, and experience. Thus, according to Petty, the four individuals promoted had greater qualifications than Wilson in terms of overall skill sets, work performance, and customer service.

Contrary to Wilson's position that the district court failed to apply the "objective qualification" standard throughout the *McDonnell Douglas* analysis, or that "no . . . objective evidence [proved] any [other] competitor [to be] objectively better qualified than Wilson," subjective factors can support an employer's justification at the second stage. *See White*, 429 F.3d at 242 n.6 ("[C]onsideration of the employer's evaluation of subjective traits or other details about why the non-protected person was in fact selected over the plaintiff" are more appropriately covered in the later stages of the *McDonnell Douglas* framework). Thus, work ethic, commitment to the job, and good patient interaction are appropriate criteria at the second stage.

However, as Wilson points out, Petty should have limited his review of Wilson's disciplinary history to the prior two years for purposes of her promotion, as called for by Clinic policy. Although ordinarily the policy would prohibit Petty from weighing the 22 instances of discipline that Wilson

accrued from 1999 to 2010, he was not foreclosed from doing so. Nonetheless, confining review to the two years preceding Wilson's September 2010 application for Workleader paints a telling picture. Wilson committed nine violations that were documented over this relatively short period for misuse of time, work avoidance, and falsification of a transport. It certainly was within Petty's discretion to take Wilson's recent record into account when evaluating her as a candidate for Workleader, and the long list of violations further supports the Clinic's proffered reason for not promoting her.

### C. Pretext

The presumption of discrimination having been rebutted, "the factual inquiry proceeds to a new level of specificity," with Wilson's shouldering the burden of "demonstrat[ing] that the proffered reason was not the true reason for the employment decision." *Burdine*, 450 U.S. at 255-56. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Despite the shifting burden of production, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

Wilson alleges she was more qualified than Knox and DeBerry because she worked as a patient transporter for a greater number of years relative to either male. But a longer term of employment does not in itself translate to a more skilled, qualified, and superior employee. She also ignores the selection criteria cited by Petty for determining the candidates best suited for Workleader. Petty and the other supervisors involved in the process considered factors such as

-8-

strong work performance, the ability to carry out job duties, efficiency in transporting patients, and good customer service skills, among other things. Wilson avoided work on multiple occasions, was slow to respond to patient transport calls, and disregarded her duties while assigned to calls. She in no way addresses the legitimacy of these concerns. Based on her 2009 and 2010 annual evaluations, in which supervisors assessed dozens of aspects relating to her performance as a patient transporter, not a single supervisor rated Wilson as "exceptional" on even one of the items listed on the form. Of note, Wilson's performance evaluation from 2010 indicated that she "need[ed] improvement" in "manag[ing] time effectively and meet[ing] established deadlines."

Additionally, Wilson alleges she was more qualified than DeBerry because she had better trips per hour ("TPH") records than him. As declared by Petty, productivity was but one of a number of factors considered. As such, productivity measures were not determinative with respect to receiving the promotion. In fact, as observed by Petty, dedicated area employees, including Knox and DeBerry, must handle the Clinic's "high volume customers" where the amount of work is "much more significant than [confronted by] general pool [employees like Wilson]," meaning that Knox and DeBerry would be "do[ing] a lot more transporting."

Lastly, Wilson claims the Clinic's TPH performance standards were "flawed" and "discriminatory." She argues that the Clinic's switch from TPH to dispatches per hour ("DPH") is somehow an admission of discrimination, as the TPH metric didn't give transporters credit for jobs that were cancelled while they were in process. Yet, Wilson failed to provide probative evidence that would allow a reasonable fact finder to conclude the system was a source of unlawful discrimination. More importantly, even if the system were flawed, it applied to all general pool

employees alike, whether male or female. Taken together, Wilson's arguments in support of her allegations of pretext do not permit an ultimate finding of discrimination.

Another matter deserves the court's clarification. The district court asserted that it "cannot substitute its business judgment for defendant's." However, "[a]n employer's business judgment . . . is not an absolute defense to unlawful discrimination." *Wexler*, 317 F.3d at 576. Indeed, "[i]n determining whether the plaintiff has produced enough evidence to cast doubt upon the employer's explanation for its decision, we cannot . . . unquestionably accept the employer's own self-serving claim that the decision resulted from an exercise of 'reasonable business judgment.'" *White*, 533 F.3d at 393 n.6.

**2. Retaliatory Suspension**

Wilson claims she was suspended in retaliation for filing her Right of Review, an internal Clinic procedure, in October 2010 and for filing her first charge of discrimination with the EEOC in December 2010. As a threshold matter, Title VII's anti-retaliation provision makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made [unlawful by Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Wilson's Right of Review filing alleged only that the procedure for calculating TPH was flawed and that her previous corrective actions for falling below the Clinic's criteria were not merited since her productivity was not being properly measured. At no point did Wilson base her grievances in the Right of Review on race, color, religion, sex, or national origin. Thus, the Right of Review filing does not qualify as protected activity under Title VII and, therefore, cannot be a basis for her retaliation claim.

A plaintiff in a Title VII action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). In the present case, Wilson did not present any direct evidence of retaliation. Instead, she advanced a circumstantial case for retaliation, which is examined under the *McDonnell Douglas* evidentiary framework that is used to assess claims of discrimination. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

### A.  Prima Facie Stage

At the prima facie stage, Wilson must show that (1) she engaged in a protected activity under Title VII; (2) the exercise of protected rights was known to the Clinic; (3) the Clinic thereafter took an adverse employment action against her; and (4) there was a causal connection between the adverse employment action and the protected activity. *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995-96 (6th Cir. 2009). The Clinic asserts that Wilson failed to show a causal connection between her suspension and the charge she filed with the EEOC. We agree.

Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* A time lag of seven months normally cannot support an inference of a causal link. *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004); *see also Parnell v. West*, No. 95-2131, 1997 WL 271751, at *3 (6th Cir. May 21, 1997)

-11-

(holding that "previous [Sixth Circuit] cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months").

Wilson filed her charge of discrimination with the EEOC on December 27, 2010. The Clinic issued the three-day suspension on September 21, 2011. Therefore, approximately nine months had lapsed between the filing of the charge and the issuance of the suspension. The gap of time between the two events, standing alone, is too attenuated to sustain a causal link. Absent other evidence of retaliation, temporal proximity here is insufficient for purposes of satisfying the prima facie case. Wilson provides no additional direct evidence of retaliation nor any further circumstantial evidence of retaliation (such as reduced salary and benefits) to establish causation. *Cf. Mickey*, 516 F.3d at 526. Therefore, she fails to establish a prima facie case of retaliation with respect to her suspension claim.

### B. Nondiscriminatory Justification

Even if we assume Wilson to have prevailed at the prima facie stage, the Clinic advanced a legitimate, nondiscriminatory reason for suspending her; namely, she violated Clinic policy by taking actions detrimental to patient safety when she left unattended a deceased patient who, in Wilson's absence, had rolled off a morgue cart and crashed to the floor. Before issuing the suspension, the Clinic conducted an investigation, after which it determined that Wilson should receive a three-day suspension, given the severity of the incident, for the associated violations. We accept this proffered reason as facially legitimate and nondiscriminatory.

### C. Pretext

Wilson alleges that the Clinic deviated from its corrective action policy when electing "not [to] follow its progressive discipline [system] and [going] straight to a three-day suspension."

Wilson insists that the progressive discipline system operated as a step function, starting at (1) documented counseling for the first offense, then escalating to (2) written warning, (3) final warning, and eventually (4) termination for each subsequent offense that occurred within a certain period after the first offense. According to Wilson, a suspension can fall anywhere "in between." This characterization is mistaken. As actually set forth in the Clinic's corrective action policy, the step of corrective action applied "may vary depending upon the nature of the infraction" and the "circumstances surrounding the offense." Wilson received a three-day suspension for "actions detrimental to patient safety," among other grounds. Such conduct is deemed a major infraction under two sections of the corrective action policy. Under the policy, major infractions subject an employee to severe corrective action, usually resulting in Step 3 unpaid suspension or Step 4 termination. Therefore, not only was the Clinic's decision to suspend Wilson within policy and non-retaliatory, it was the more lenient of two possible forms of discipline for which she was eligible, the other being termination.

Wilson also argues that she was retaliated against as suggested by the Clinic's decision not to discipline Darlene Brooks, the primary transporter on the assignment. Wilson draws attention to the fact that Brooks entered the deceased patient's room without a nurse, in violation of department policy,[1] and was not disciplined. She then attempts to lead this court to believe that she was suspended while Brooks was spared because Brooks had not filed an EEOC charge against the Clinic. We are not convinced by the logic, as Wilson omits a key fact distinguishing her from Brooks: Wilson violated a serious, heavily emphasized department policy commanding transporters that "UNDER NO CIRCUMSTANCES WILL A PATIENT BE LEFT UNATTENDED." The irony

---

[1] Clinic Policy #4110 states that "[w]hen arriving to pick up a patient from their room, the transporter will not enter the room without a member of the nursing staff to accompany them."

-13-

is that Wilson was equally as culpable as Brooks for entering the patient room without a nurse, but neither transporter was punished for the oversight. Both transporters were treated the same in this regard. However, it was Wilson, not Brooks, who abandoned the patient's side with no one else present. In sum, Wilson failed to establish pretext and summary judgment is warranted on her retaliatory suspension claim.

## 3. Retaliatory Termination

Wilson asserts that she was terminated in February 2012 in retaliation for filing a second charge of discrimination with the EEOC in November 2011. As before, the claim is evaluated under the *McDonnell Douglas* framework. The Clinic argues that Wilson fails to establish a prima facie case because there is no causal connection between her filing the second EEOC charge and the termination. The Clinic further argues that Wilson cannot show pretext.

### A. Prima Facie Stage

Temporal proximity alone can, in certain circumstances, suffice to show a causal connection in a retaliation case. *Mickey*, 516 F.3d at 525. As we explained in *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007), and recently reiterated in *Gambill v. Duke Energy Corp.*, 456 F. App'x 578, 589 (6th Cir. 2012), "this Court has typically found the causal connection element satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity." A lapse of approximately three months, as is the case here, is sufficient to show a causal connection. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (concluding that a lapse of three months is a short enough period of time to demonstrate a causal connection and allow the court to infer a retaliatory motive); *see also Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007).

-14-

**B. Nondiscriminatory Justification**

Because Wilson establishes a prima facie case, the burden of production shifts to the Clinic to articulate a legitimate, non-retaliatory explanation for the action. Wilson's termination relates to her transport of a patient who had undergone surgery involving the placement of vaginal rods. The Clinic "terminated plaintiff's employment for her unacceptable job performance which caused or contributed to unsafe conditions or unsafe procedures as a result of [disregarding] the nurse's instruction to wait for additional help and [instead] mov[ing] the patient herself." The employee corrective action report documenting Wilson's termination states that she failed to use good judgment, failed to follow department procedure for conducting a lift of the patient from gurney to bed, and that she "admitted to hearing the nurse's instruction" that "four people [would be needed] to complete th[e] lift" and "chose to go against procedure because she thought she could perform the lift without the additional help." With this evidence, the Clinic successfully rebuts the inference of retaliation, and the burden shifts once again to Wilson to show, "by a preponderance of the evidence," that the proffered explanations are mere pretext. *See Burdine*, 450 U.S. at 253.

**C. Pretext**

The Clinic has provided several legitimate, non-retaliatory reasons for terminating Wilson. She must now produce sufficient evidence from which a jury could reasonably reject *each* independent reason for why the Clinic fired her. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Wilson argues that the Clinic's reasons for terminating her are not based in fact and, separately, are insufficient to explain its actions.

First, she argues that a formal, written procedure did not exist for transporting patients with vaginal rods. Even if true, this is beside the point. Despite not aligning with the four-person lift procedure cited by Taylor, Caraballo, and Petty, Wilson's deposition testimony indicates she was nonetheless aware of a procedure for transferring patients with vaginal rods. According to Wilson, "moving [a patient] with vaginal rods" is a three-person job, in which "two people [are] on each side of the patient and someone [is] at the feet" in order to ensure "a safe movement [ ] from one bed to the next." She further describes the move as necessitating a slide, rather than a lift. She testified that she learned this procedure "[t]hrough nursing staff and in asking questions." It is undisputed that the transfer of the vaginal rod patient at issue here involved only two people—Wilson and, at Wilson's urging, Page. Wilson asserts that she was not informed of the vaginal rods or given any pertinent background on the patient. Even accepting this, we nonetheless find she has not demonstrated pretext. One of the violations cited in Wilson's termination report was for "[u]nacceptable job performance causing or contributing to unsafe conditions or unsafe procedures." Wilson, as does the dissent, focuses on the absence of a formal, written procedure in an attempt to excuse her unacceptable job performance. The fact remains that Wilson caused or contributed to unsafe conditions. Wilson's testimony reveals that Wilson and Page entered the patient's room together and waited approximately 15 minutes for Taylor to arrive, during which time Wilson was "getting . . . anxious." The patient had already been prepped, Wilson and Page were "situated" and "ready" for the transfer, and they "[were] just waiting on the nurse to . . . help [ ] with the movement." As admitted, "all that was on [Wilson's] mind" during this assignment was to meet her minimum trips per hour expectation. Had it been safe and acceptable practice to use only two people for the transfer, why would Wilson not have done so far sooner, especially considering her

preoccupation with making her minimum trips per hour requirement? Wilson decided to complete the move without the very person for whom she was waiting, the nurse, which in itself caused or contributed to unsafe conditions. It also reflects her failure to use good judgment. There is no other explanation that can be read from the record for the time Wilson allowed to elapse, nor does she offer one. If there were a policy requiring that the nurse be present during the transfer, even without requiring her participation, Wilson would have run afoul of that policy by proceeding in the nurse's absence; Wilson does not direct us to any such policy.

Since the dissent misapprehends this point, it bears emphasizing that unacceptable job performance—through causing unsafe conditions or performing an unsafe procedure—very well could subject Wilson to termination. Clinic policy clearly states that "[r]egardless of the group in which an offense is listed, [i.e., whether an offense is categorized as an "infraction of a minor nature" or an "infraction of a major nature,"] a particularly flagrant violation of an otherwise less serious offense may result in a more serious level of corrective action than the one indicated for that group." Moreover, the dissent ignores the fact that Wilson was in "progressive corrective action" status for "an offense that occur[red] within one year after issuance of previous corrective action," namely, her suspension in connection with the corpse incident. As such, the disciplinary action levied was to proceed to the next step, which is termination. In fact, Wilson's corrective action report for the corpse incident explicitly states that "[f]urther incidents of unacceptable job performance or violation of Cleveland Clinic or departmental policy may result in further disciplinary action up to and including termination."

The dissent also overlooks the other independent reasons provided for terminating Wilson. The termination report cites violations of Policy #121-II-U and Z for "actions detrimental to patient

safety," specifically, "[f]ailure to fulfill the responsibilities of the job to an extent that might reasonably or does cause injury to a patient" (Policy #121-II-U) and engaging in "conduct seriously detrimental to patient care." (Policy #121-II-Z). These two provisions refer to violations that are classified as "[i]nfractions of a major nature," which are "severe" and typically result in Step 3 unpaid suspension or Step 4 termination even when progressive status is not in effect. Wilson does not directly respond to these proffered reasons. Regardless, the termination report further indicated that Wilson "admitted to hearing the nurse's instruction" but chose to proceed because "she thought she could perform the [transfer] without the additional help." The dissent claims "evidence exists," in the form of Wilson's deposition testimony, "that the nurse never gave Wilson the instruction Wilson supposedly ignored"; however, this evidence is merely a bare denial of one of the Clinic's legitimate, non-retaliatory reasons for terminating her. It is insufficient to create a genuine issue of material fact. As the Supreme Court has emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record *taken as a whole* could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986) (emphasis added and footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original). Evidence that is merely colorable or not significantly probative is not sufficient to establish that there exists a genuine issue of material fact. *Id.* at 249-50.

There is no issue for trial unless *sufficient* evidence supporting the claimed factual dispute is shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. *Id.* at 249.

Simply put, "facts must be viewed in the light most favorable to the nonmoving party *only if* there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). And, in determining whether there is a genuine issue for trial, the Supreme Court repeatedly has endorsed looking to the record as a whole. *See, e.g.*, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *Matsushita*, 475 U.S. at 587; *Scott*, 550 U.S. at 380. The dissent's election to close its eyes to the entirety of the record and instead view in isolation Wilson's evidence—a bare and unsupported denial to the nurse having given an instruction to wait—flies in the face of longstanding and controlling precedent. Here, Caraballo, who Wilson states "never had work problems with [her]," transcribed notes from the February 8 meeting in which Wilson recounted her version of the events underlying the incident with the vaginal rod patient. Caraballo wrote:

> [Wilson] states that she asked the nurse to help with the transfer but that the nurse said with a negative demeanor "no, I am going to get help" and walked out of the room. [Wilson] said that she waited in the room with the [nurse assistant] for about 15 minutes for the additional help and since no help had arrived she decided to transfer the patient without help.

Taylor, who reported Wilson, testified to have neither known nor worked with Wilson prior to the incident, and that she had told Wilson "more help [was] on the way so that [the patient] could [be] lift[ed] from the stretcher to the bed." Taylor went on to testify that she "asked them to hold on so that more help could come . . . for us to move the patient safely." Page testified that before the transfer, the nurse gave a command: she "was . . . say[ing], . . . wait." Even more directly to the point, Wilson concedes in her principal brief that "[t]he nurse . . . told [Wilson and the nurse assistant] to stop and wait for help."

-19-

Separately, Wilson presents the alleged disparate treatment between Wilson and Page as evidence of pretext. As a threshold matter, we must determine whether the two employees even can be considered similarly situated.

> [T]o be deemed "similarly situated" in the disciplinary context, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). We have come across no case where two individuals, with two different job titles, with two different job functions, from two different departments, who report to different supervisors, who had engaged in unequal conduct—whereby one individual initiated the conduct and the other passively followed—have been considered "similarly situated." This case before us is no exception.

Regardless, at the pretext stage, we look to similarly situated employees not to evaluate the employer's business judgment, but to inquire into the employer's "motivation and intent" to determine whether the employer was "motivated by retaliation." *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 503 (6th Cir. 2009) (quoting *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)). The fact that the Clinic chose to issue Wilson a lesser punishment in the form of suspension rather than termination in September 2011 for the corpse incident is strong evidence that its final decision to terminate her employment in February 2012 for taking actions detrimental to patient safety was not a pretext for retaliation. *See Staunch v. Continental Airlines*, 511 F.3d 625, 632 (6th Cir. 2008). As Wilson indicated during her deposition, human resources "said that [the corpse incident] warranted

[her] termination." Nonetheless, Wilson received the more lenient of two possible forms of discipline for which she was eligible.

In sum, Wilson fails to create a genuine issue of material fact to survive the well supported summary judgment motion against her. At best, Wilson created only a weak issue of fact as to whether the Clinic's reasons were insufficient or untrue, but there is abundant independent evidence that no retaliation had occurred, and so the Clinic is entitled to summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000); *Liberty Lobby*, 477 U.S. at 250-251. However, even if Wilson did provide sufficient evidence to create a genuine issue of material fact regarding the soundness of the Clinic's proffered reasons, the Clinic still would be entitled to summary judgment. As the dissent has recognized in *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012), "[w]e have adopted the honest belief rule, reasoning that it is not in the interests of justice for us to wade into an employer's decisionmaking process." (citation omitted). "When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen*, 580 F.3d at 401 (quoting *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-15 (6th Cir. 2007)). The key inquiry is "whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007). To overcome the employer's invocation of the honest belief rule, the employee "must allege more than a dispute over the facts upon which [the] discharge was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-[retaliatory] reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

The Clinic relied on particularized facts in its decision to terminate Wilson and was reasonably informed prior to doing so. Although Taylor's written witness statement was received by the patient transportation department on February 13, the date of Wilson's termination, she had previously filed an electronic report on February 6, the date of the incident. The contents of this electronic report were e-mailed to Caraballo the same evening as the incident. Caraballo immediately forwarded the e-mail to Petty. The very next day, Petty, along with the director of the Patient Transportation department, together spoke with "the nurse about the situation [and] also talked to the [nurse assistant] who was [ ] in the room." As averred in Petty's sworn testimony, on February 7, the nurse assistant "said that she was not in position to really move [the] patient, and that [Wilson] told her 'we can do this,' and [Wilson] started to proceed to pull the patient . . . ." According to Petty's in-person investigation of the matter, Page indicated she "didn't think that [Wilson] would go ahead and proceed with pulling the patient until the other people got in the room" and only assisted by "grabb[ing] the patient's legs" because of Wilson's sudden movement. Contrary to the dissent's contention, the timing of the witness statements does not discredit the information that Petty had already gathered from the same witnesses prior to terminating Wilson. The witness statements from Taylor and Page only served to further corroborate the facts already set forth by them earlier, as well as corroborate the facts Wilson admitted during her February 8 meeting with Caraballo and Petty. Nevertheless, despite the adequacy of the investigation, "the decisional process used by the employer [need not] be optimal or . . . le[ave] no stone unturned" in order to invoke the honest belief rule.

**AFFIRMED**.

**COLE, Chief Judge, dissenting in part.**  The Cleveland Clinic Foundation claims it fired Loletia Wilson because she ignored a nurse's instruction, violated Clinic policies against performing unsafe procedures, and did not follow department procedure for transporting patients with vaginal rods.  But evidence indicates that the nurse never gave the alleged instruction, Wilson did not know the patient had vaginal rods, and the Clinic did not have a formal procedure for transporting such patients.  Moreover, the Clinic fired Wilson before it received relevant witness statements, and it never disciplined the nursing assistant who performed the move with Wilson.  In other words, Wilson put forth evidence that the Clinic's reasons for firing her were pretextual.  For that reason, and because she made out a prima facie case, as the majority admits, Wilson must be allowed to present her retaliatory termination claim to a jury.

Wilson may show pretext with evidence that the Clinic's supposed reasons for firing her had no basis in fact, were not the actual reasons, or were insufficient to explain her termination.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392–93 (6th Cir. 2008).  At least five points support Wilson's argument for pretext.

First, evidence exists that the nurse never gave Wilson the instruction Wilson supposedly ignored.  Wilson testified as much at deposition.  She also noted that the nurse simply walked away while Wilson and the nursing assistant prepared to move the patient.  And she specifically testified that she never admitted that the nurse told her to wait for more help before moving the patient.  The majority apparently concedes that this evidence creates a dispute about a material fact, but it claims the dispute is not "genuine."  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Surely a rational trier of fact could find for Wilson, given her sworn deposition testimony

-23-

directly on point. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). If not, it is hard to imagine how a plaintiff could ever get past summary judgment when the only other eyewitnesses side with the defendant.

The majority dismisses Wilson's testimony, instead resting its analysis on an internally-prepared Clinic document and Clinic witnesses' deposition testimony. This the court may not do. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The majority improperly credits the Clinic's version of a material fact in the face of Wilson's sworn testimony to the contrary. Wilson's alleged admission that she heard the nurse's instruction plays a key role in the majority's attempt to discredit her arguments. That the majority may not rely on the admission spoils its analysis.

Second, Wilson did not know the patient had vaginal rods before she moved her. No one—not her manager, not the nurse, not the nursing assistant—ever mentioned this important fact. So why would the Clinic punish Wilson for failing to follow a procedure she couldn't have known she needed to follow? The majority has no answer to this question, falling back on the claim that Wilson nevertheless "caused or contributed to unsafe conditions." It omits the rest of the alleged reason the Clinic fired Wilson: that she "caused or contributed to unsafe conditions *as a result of her failing to abide by the nurse's instruction to wait for additional help and her decision to move the patient herself*." The evidence properly considered is that the nurse did not give Wilson an order before Wilson moved the patient.

The majority also relies on arguments not raised by the Clinic, including that the Clinic's reasons for firing Wilson were not pretextual because Wilson waited fifteen minutes for the nurse

to arrive before moving the patient. The majority infers that Wilson waited because she knew that moving the patient with only two people would be unsafe or unacceptable. But waiting for a nurse to lend a hand might be good practice, might make the move easier, or might simply be polite. Waiting does not necessarily imply that Wilson knew a two-person move would be improper. The majority's inference against Wilson is inappropriate at this stage. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." (quotation marks omitted)).

Third, the Clinic did not have a formal procedure for transporting a patient with vaginal rods. Again the majority does not disagree. The nurse confirmed that the alleged procedure was not written, testifying that nurses on her floor "just . . . know how to handle" a patient with vaginal rods and that lifting, rather than sliding, such a patient is "just [the procedure] we typically follow." The majority also admits that Wilson never received training from the Clinic in the proper technique for moving a patient with vaginal rods. This evidence strongly suggests that a clear Clinic procedure for moving vaginal-rod patients simply did not exist, severely undercutting the Clinic's claim that it fired Wilson for not following "department procedure."

In support of the Clinic, the majority again makes arguments the Clinic itself does not make. The majority claims that the Clinic properly fired Wilson because Wilson knew of *a* procedure for transporting vaginal-rod patients, even if not the four-person lift procedure all the Clinic witnesses said Wilson should have followed. First, the fact remains that credible evidence suggests that the Clinic's claimed procedure did not exist—the whole point of this pretext inquiry. Second, even if Wilson knew of *a* procedure, she did not know this patient had vaginal rods. If the Clinic truly had

-25-

a procedure that Wilson should have followed, one might expect the Clinic to give Wilson the information needed to know to follow the procedure.

Fourth, the Clinic fired Wilson before it received relevant witness statements. The nurse and nursing assistant—the only other employees who witnessed the incident—did not provide written statements until *after* the Clinic had fired Wilson by phone. The majority attempts to use the honest belief rule to inoculate the Clinic, arguing that before the Clinic fired Wilson it relied on alleged interviews with the nurse and nursing assistant and an electronic incident report from the nursing assistant. But no one involved in the decision to fire Wilson has claimed that he or she relied on the alleged interviews or earlier electronic report. And if the Clinic actually relied on the report, why did it ask the nursing assistant to write another report a week later?

Moreover, the honest belief rule's protection "is not automatic. . . . [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce proof to the contrary." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1999) (quotation marks omitted). Our court will not "blindly assume that an employer's description of its reasons is honest." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir. 2006) (quotation marks omitted). Here, Wilson has called into question the integrity of the termination process. A manager of Wilson's department admitted that witness statements should be taken as close as possible to the time of an incident and that "discipline should take place after the investigation was complete." Contrary to that manager's characterization of the Clinic's investigatory process, another manager fired Wilson before investigating all the facts, again raising the inference of retaliation.

Fifth, the Clinic never disciplined the nursing assistant who performed the move with Wilson, though the two employees were similarly situated. Wilson and the nursing assistant

-26-

performed the same action at the same time, which posed the same safety risk, ignored the same alleged nurse's instruction, and violated the same alleged department procedure. Yet the Clinic fired Wilson and did not so much as criticize the nursing assistant. As the majority points out, whether an employer treats similarly situated employees differently bears on the employer's motivation and intent. *Ladd v. Grand Trunk Western R.R.*, 552 F.3d 495, 503 (6th Cir. 2009). Indeed, the nursing assistant was arguably *more* culpable than Wilson. The nursing assistant knew the patient had vaginal rods, was fragile, and should be lifted rather than slid, but she did not reveal any of this information to Wilson during the fifteen minutes the two waited for the nurse to arrive. Nor did she resist helping Wilson slide the patient, though she could have protested. The Clinic fired Wilson, but it did not discipline the nursing assistant at all, and this disparate treatment points again to pretext.

The court's job at this juncture is not to pick a winner. We may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 249, and we must draw all inferences in the light most favorable to Wilson, *see Matsushita*, 475 U.S. at 587. The majority makes the arguments defense counsel might make to a jury. But our sole task is to consider "whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). There is. Certainly the evidence is not "so one-sided that [the Clinic] must prevail as a matter of law." *Anderson*, 477 U.S. at 243. A jury could ultimately side with the Clinic, but that Wilson "may have a difficult time winning [her] case does not disable [her] from trying, at least so far as Rule 56 is concerned." *Jones v. Garcia*, 345 F. App'x 987, 990 (6th Cir. 2009).

Simply put: Wilson provided enough evidence of pretext to create genuine disputes of material fact that must be resolved by a jury. I therefore respectfully dissent from Part 3.C. of the majority opinion; I would reverse the district court's grant of summary judgment on Wilson's retaliatory termination claim.